CONLEY, J.T.C.
This action involves local property tax assessments on a “super regional” shopping center known as the Quaker Bridge *490 Mall. The Mall is located on a 100-acre tract at the intersection of U.S. Route 1 and Quakerbridge Road in Lawrence Township, Mercer County, halfway between Princeton and Trenton. The Mall consists of four major department stores (Bamberger’s, Hahne’s, J.C. Penney and Sears) and approximately 130 specialty shops, restaurants and other retail establishments. All of the smaller shops and restaurants are in an enclosed, two-story structure with considerable amounts of common area. This structure is between and serves to connect the four department stores.
Super regional shopping malls such as Quaker Bridge Mall are the largest of the various shopping centers that have proliferated across the United States in the past two decades, providing an alternative to and in some instances even replacing the traditional downtown shopping districts of many communities. Super regional malls tend to have over 1,000,000 square feet of leasable area, four to six major department stores and a wide variety of small retail businesses. They also have comprehensive operating agreements of the kind to be discussed in this opinion between the developer and the department stores and shop tenants. At the other end of the range are neighborhood shopping centers which typically have fewer than 125,000 square feet of leasable area. The dominant store in such a complex is almost always a food store. Other independently owned and operated businesses are usually a drugstore, hardware store and beauty salon. The developer or owner of a neighborhood shopping center has little ability to control the operation of the individual stores at his center. Somewhat larger are community shopping centers, frequently with a junior department store and a greater variety of small shops in addition to the stores in a neighborhood center. These shopping centers tend to be less than 350,000 square feet in size and have an essentially local orientation. The next largest centers are regional shopping malls. These often have two or three major stores and up to 750,000 square feet of leasable space. They are almost always one story in height and are necessarily quite expansive. Region *491 al shopping malls usually have operating agreements between the developer and the retailers.
There are approximately 15 super regional shopping centers in New Jersey. Each of these draws consumers from a relatively wide area, frequently from more than one county. Some of the super regional malls in New Jersey, in addition to Quaker Bridge, are the Bergen Mall Shopping Center, the Cherry Hill, Deptford and Ocean County Malls, Paramus Park Mall, Rockaway Townsquare Mall, the Short Hills and Willowbrook Malls and the Woodbridge Center.
In the present matter involving the Quaker Bridge Mall, plaintiff contests the assessments and added assessments placed on most of the Mall property for the first three years of its operation.[1] The major portion of the Mall, identified on the tax map of Lawrence Township as Block 47, Lot 5 and consisting of 70.12 acres[2], was assessed as follows for the years specified:
Land
Improvements
Total
Land
Improvements
Total
1976 Assessment
$ 2,559,000
11,017,700
$13,576,700
1977 Assessment
$ 3,506,100
49,953,000
3,459,100
1976 Added Assessment (as of May 1,1976)
$ 0 25,956,867
($38,935,300 prorated for 8 months)
$25,956,867
1977 Added Assessment (as of Feb. 1,1977)
$ 0 1,483,900
($1,618,800 prorated for 11 months)
$ 1,483,900
*492 1978 Assessment $ 3,506,100
1978 Added Assessment (as of July 1,1978)
Land
$ 0 ($171,600
prorated for 85,800 6 months)
Improvements
Total
51,571,800
$55,077,900
$85,800
Plaintiff also contests the assessment on Block 45, Lot 51, located across Route 1 from the Mall and providing access to and from the Mall for southbound traffic on Route 1 via an overpass. The assessment on this 3.38 acre lot for both 1977 and 1978 was as follows:[3]
Land
Improvements
Total
$259,400
0
$259,400
Plaintiff appealed each of the assessments set forth above to the Mercer County Board of Taxation, which affirmed them all.
The parties are in agreement that the Mali improvements were substantially completed as of October 1,1976, the assessing date for the tax year 1977. N.J.S.A. 54:4-23. The 1976 assessment, sometimes referred to as a partial assessment, as well as the 1976 added assessment, reflect earlier stages of construction. Cf. Snyder v. South Plainfield, 1 N.J.Tax 3 (Tax Ct.1980). The slightly higher assessments subsequent to the initial 1977 assessment reflect the fact that additional finishing work was done and full occupancy took place after October 1, 1976.
Inasmuch as the contested assessments are for three separate tax years and the Mall was at a different stage of completion on each of the relevant assessing dates, a chronicle of the Mall’s development is helpful in the analysis of the assessments to follow. The earliest relevant date is 1968 when R.H. Macy & Co., Inc. acquired options on the vacant land. In November 1968 representatives of Macy’s explored development of the site with *493 the Lawrence Township Committee and the township planning board, economic development committee, board of adjustment and the Ewing-Lawrence Sewerage Authority. In 1969 Macy’s filed a letter of intent with the township and the township authorized the sewerage authority to work on plans for new sewer mains. In April 1969 the township adopted a new zoning ordinance which rezoned the site to permit development of a regional shopping center.
Subsequently, Macy’s (through a subsidiary) joined with Kravco, Inc. to form plaintiff Lawrence Associates to develop, construct and operate Quaker Bridge Mall. Lawrence Associates is a limited partnership organized under the laws of New Jersey. Kravco develops, manages or has an equity interest in regional shopping malls at various locations around the country. As a part of this undertaking, Macy’s agreed to sell the land to plaintiff and to commit a Bamberger’s store to the project; Kravco agreed to provide its development expertise for a nominal developer’s fee. Plaintiff then began business feasibility studies, traffic studies, environmental reports, architectural and engineering design work, soil inspection, test borings and similar preconstruction efforts.
One of the earliest decisions made in connection with the development of the Mall involved the number and identity of the major department stores to be included. Frequently characterized within the industry as “anchor” or “magnet” stores, the number of department stores and the attraction of their trade names in a particular market are among the principal factors affecting a shopping center’s success. The major stores not only attract shoppers but their presence also induces smaller merchants to rent space at a mall. The merchandising mix of majors located at a regional mall is also important. Without at least one general merchandiser, such as Sears or Penney’s, a center’s prospects of realizing the critical mass of shop merchants is diminished. To facilitate that objective, Lawrence Associates at an early stage secured the commitment of J.C. Penney to enter the Mall along with Bamberger’s.
*494 Other early and basic decisions with respect to the Quaker Bridge Mall, as with any regional shopping center, dealt with its size, configuration and overall design. Decisions regarding how the overall structure would be situated on the site, whether the shop area would comprise one or two levels and whether access would be limited to department store entrances were all calculated to optimize retail sales volume. For example, Lawrence Associates decided to create a two-level mall in spite of the fact that construction costs would be greater, a decision predicated on an analysis that the resulting structure would produce a higher volume of sales than would a one-level mall of equal area. It is not disputed that design considerations such as this, together with appropriate regulation of temperature, humidity and lighting, contribute to the inclination of consumers to frequent the Mall. Plaintiff’s experts made the point, which seems almost self-evident, that the fragmented ownership of traditional central business districts is not typically conducive to a similar degree of physical and marketing coordination.
Unlike a central business district, a super regional shopping center functions pursuant to an operating agreement which embodies the understandings among the major stores and the developer. In the Quaker Bridge Mall operating agreement, the four major stores agreed to conduct business at the Mall under their respective trade names for a minimum of 20 years, after which they must conduct business at the Mall for an additional 10 year period as full-line department stores, although not necessarily under their own trade names. This covenant requires the majors to rebuild their stores in the event of destruction or damage by fire or other casualty. The majors must also be open for business continuously during certain specified minimum hours and they must provide reciprocal easements for parking and pedestrian access through their stores to the Mall’s common areas and shops. Similarly, plaintiff makes certain warranties and guarantees concerning the development of the Mall and the services that plaintiff will provide in connection with the management of the center.
*495 Plaintiff’s experts likened the operating agreement of a regional shopping center to its “constitution,” permitting all participants to enhance their various interests in a manner unique to large shopping centers. For example, according to plaintiff, by attracting major dominant retailers to the center, the developer is able to lease the Mall on premium terms. The more powerful the trade names which the developer succeeds in bringing to the center, the more favorable the terms of the leases it can command from Mall tenants. Plaintiff argues, and I find its point valid, that the benefits of the arrangement accrue to department stores as well as to smaller tenants. All the retailers profit from the overall marketing impact of their respective contributions to the retailing center, such as from their trade names and common hours of operation. This effect of the Quaker Bridge Mall operating agreement is central to plaintiff’s position on the issue of the value of its real property, for reasons to be discussed later.
In the early stages of a project such as the Quaker Bridge Mall, after commitments from department stores have been obtained, the developer is in a position to begin to lease the smaller shop spaces. This process involves judgments regarding desirable trade names, types and prices of merchandise and the quality of the store finishes desired for the overall effect sought to be created at the center. In the case of Quaker Bridge Mall, plaintiff retained the right to disapprove any proposed tenant improvements such as the design of any storefront to be constructed and the type of floor covering and other finishes to be used. As a result of plaintiff’s intention to create what it terms a “synergy” among its merchandisers, and in order to maximize the overall appeal of the center, space was not necessarily leased at the highest rate per square foot which it might have commanded nor was it leased to tenants who did not conform to plaintiff’s merchandising concept for the Mall.
A central tenet of plaintiff’s position in this litigation is that much of the value of the Quaker Bridge Mall is attributable to plaintiff’s extremely good management, which would not be taxable, rather than to the taxable real property. In support of *496 this opinion plaintiff’s experts stressed that a super regional shopping mall is a dynamic entity, the success of which depends on its ability to draw shoppers from competitive retail stores and centers. Plaintiff contends that ownership of a super regional mall like Quaker Bridge, unlike a passive real estate investment, requires continuing expenditures of substantial sums of money, time and effort to maximize the business transacted at the mall and, thereby, to command high rents. Plaintiff established that these efforts at Quaker Bridge include such details as monitoring sales to ensure that the tenant mix is appropriate and that weaker retailers either are assisted to improve business or are replaced by stronger tenants. To this end Lawrence Associates employs a sophisticated computer system which analyzes operating data for all 130 Mall tenants. When the computer analysis reveals data, trends, or aberrations of significance, plaintiff is able to call that information to the attention of the tenant to assist it in the improvement of its performance.
In addition, plaintiff regularly creates promotions to draw customers to the Mall. Although the most prominent of these promotions occur during Easter and Christmas, which constitute the biggest selling seasons of the year, they are run routinely year-round and include events such as arts and crafts displays, flower shows, automobile shows, gem and mineral shows, sidewalk sales and various forms of live entertainment. Plaintiff is also instrumental in advertising sales and promotions at the Mall. This is done typically by the periodic publication of a newspaper in tabloid format which describes the promotions and contains advertising for Mall merchants. Plaintiff promotes these tabloids, which are generally prepared by an outside professional, through periodic flyers which it circulates among the Mall merchants. Plaintiff also generally follows up sales promotions with exit and telephone surveys conducted by professional canvassing organizations, the purpose of which is to determine consumer reaction to the Mall and to various promotions. These efforts assist both developer and merchants in improving merchandising programs and provide information regarding competitive forces operating in the Mall trading area. *497 Obviously, the ultimate objective of these measures is to enhance the volume of business generated by Quaker Bridge Mall.
The physical structure of the Quaker Bridge Mall complex is, of course, of paramount concern with regard to the value of the subject property. The first physical construction was certain grading done at the site late in 1974. The principal construction began in the early summer of 1975 and continued thereafter until early November 1976. The construction of the main part of the Mall was done by a well-known construction firm which also acted as construction manager for the project. The firm was reimbursed on a cost-plus-a-fee basis. As is typical of construction projects of this magnitude, the actual work was performed by subcontractors engaged by the general contractor and selected on a low-bid basis.
The entire complex (including the separately assessed Sears and J.C. Penney stores) constitutes a shopping mall of approximately 1,300,000 square feet of building area. As was stated at the outset, the assessments on the Sears store (approximately 202.000 square feet) and the Penney improvements (approximately 167,000 square feet), and the portion of the tract allocated to these stores[4], are not included in this proceeding. The gross building area under appeal consists of 566,716 square feet of tenant stores and common area, the Bamberger’s store of 214.000 square feet and the Hahne’s store of 151,465 square feet, a total of 932,181 square feet. Thirty-five acres of the surrounding tract have been improved for parking (5,600 spaces) and internal ring roads have been built both to direct traffic flow on the site and to connect with public thoroughfares. The site has been terraced and graded to provide direct access to both the lower and upper levels of the department stores from the parking areas. There is a common area walkway on each level of the central structure that connects to the four department stores. Also in the common area are ten attractively *498 landscaped atrium areas which include ponds and water fountain arrangements as well as children’s play and seating areas. The atrium areas include three sets of stairways and a central escalator.
The basic construction of the two-story portion of the Mall between the department stores consists of a concrete slab floor, fire-proof structural steel framing, fluted block and face-brick exterior walls and a flat built-up roof on a metal deck. Heating and air conditioning for the common area and the tenant stores are supplied by a hot and chilled water system. The entire complex is sprinklered. There are fire alarm and intercom systems and two 3,500 pound capacity freight elevators. Ceiling heights are 18 feet floor to floor and twelve feet in the stores. Most stores have back doors leading to rear corridors. In addition to the many separate stores there are approximately 700 square feet of offices on the first floor level and kiosks disbursed throughout the common area. Interior floor finish in the common areas consists of wood parquet, terrazzo and brick. The Mall stores have a variety of storefronts and interior finishes as will be discussed in some detail later. Mall offices have wall-to-wall carpeting, vinyl-covered walls and painted plaster or acoustical tile ceilings. Washrooms have ceramic tile floors and wainscoting. Rear corridors behind the Mall stores have concrete floors, concrete block walls and plasterboard ceilings.
Each of the department stores was built by the company operating the department store or an affiliate and not by the developer of the shopping center. Bamberger’s is a two-story, masonry and steel department store of excellent quality. It is constructed of concrete slab on grade, fire-proof structural steel framing, white brickface exterior walls with glass panels at the entrances and a flat, built-up composition roof. Heat and air conditioning are supplied by a central zone system. The building is sprinklered throughout. There are escalators, passenger and freight elevators and a variety of quality lighting fixtures. Interior finish in the sales display area consists of wall-to-wall carpeting with white glazed tile in the aisles, painted plaster *499 board walls and acoustical tile ceilings. The store contains a restaurant and kitchen as well as washroom, storage and office areas.
The Hahne’s store is a two-story, masonry and steel department store of good quality. General construction consists of concrete slab on grade, fire-proof structural steel framing, walls of white facebrick and stone aggregate on concrete block and a flat, built-up roof on a gypsum deck. Heat and air conditioning are supplied by a central system. There is glazed block around the interior entrances. The building is fully sprinklered and has smoke and burglar alarm systems. Interior finish in the sales display area consists primarily of wall-to-wall carpeting, painted plasterboard walls and acoustical tile ceilings with fluorescent and spot lighting fixtures.
An account of the finishing of the 130 smaller stores is significant at this point. Plaintiff contends that much of the work done by its tenants did not become taxable as real property and that much of the costs associated with such work should therefore not be considered for purposes of determining the value of the subject property. As is typical in the case of super regional malls, plaintiff provided tenants with unfinished space, referred to in the industry as “shells.” A shell consists of the roof and cement subfloor together with demising strips or block walls for the rear and side walls of the stores. Most of the side walls separating the stores consisted of aluminum studs upon which the tenants were required to erect sheetrock and such other wall finish as they deemed appropriate. Plaintiff provided the service (or “hook-ups”) for electricity and plumbing and for heating, ventilating and air conditioning units, but the tenants were required to complete the systems by providing the operating components. More specifically, each tenant was required to do all of its own electrical installation. This encompassed running wiring from a junction box outside the tenant’s store into the store and throughout the tenant’s rented space and installing all electrical and lighting equipment essential to the use and occupancy of the premises. Each tenant also had to install lavatories (including all necessary plumbing) and any *500 other plumbing required for the tenant’s' use and occupancy, and it had to install a sprinkler system throughout its store area. Plaintiff provided a hot and chilled water outlet at the perimeter of each of the 130 stores but each tenant had to run the necessary pipes and install the necessary equipment to convert the hot and chilled water from plaintiff’s system into heat and air conditioning.
In addition each tenant was required to install its own storefront or other improvements to separate its store area from the Mali’s common area. The tenants also did all interior construction required for their use and occupancy, including the construction of partitions around the lavatories and the construction of interior walls creating offices, storage afeas and dressing rooms whenever necessary. Typical tenant finishes included floors and floor coverings of wood, glazed block, resilient tile and wall-to-wall carpeting; wood panelling and painted plasterboard walls; and acoustical tile, textured plaster, and painted plaster ceilings. This approach of providing a tenant with unfinished space that he must complete has come to be known in the industry as leasing on a “shell and allowance” basis. The practice complements the desire of many tenants to complete and decorate their own spaces, including storefronts, in ways that project their individual images and marketing concepts. It is commonly known, for example, that retailing chains and multistore operations frequently design the interiors of their stores uniformly with respect to such things as colors, carpets, lights and storefronts as extensions of their company logo.

Preliminary Issues

The facts recited above dealing with the development and operation of a super regional shopping center give rise to a number of important issues that need to be resolved prior to a determination of the property’s value. Indeed, much of the attention of the parties and their experts at trial focused on *501 these preliminary issues.[5] In a sense, all of these problems involve one very basic issue, which is the question of what aspects of the Quaker Bridge Mall are properly taxable as real property by Lawrence Township.

A. Real Property v. Real Estate

Plaintiff contends that there are elements of value in the Quaker Bridge Mall enterprise quite apart from the value of its fee simple interest in the real estate and that much of that additional value may not be taxed by Lawrence Township pursuant to N.J.S.A. 54:4-1 et seq. On the other hand, the township contends that additional value attributable to such things as tenants’ leasehold improvements is properly subject to the local property tax. The experts spoke of this aspect of the issue in terms of the “bundle of rights” inhering in the Quaker Bridge complex, meaning that the Mall has freehold and leasehold interests, tenant as well as landlord improvements, and operating covenants and other intangible rights affecting plaintiff, the department stores and the 130 shops — all of which rights have proven to be an integral part of the Mali’s success. See American Institute of Real Estate Appraisers, The Appraisal of Real Estate (7th ed. 1978), at 15-16.
The parties have repeatedly used the terms “real estate” and “real property” in advancing their respective positions on this issue and the definitions of these words should be understood:
REAL ESTATE — This refers to the physical land and appurtenances, including structures affixed thereto. In some states, by statute, this term is synonymous with real property [footnote omitted],
REAL PROPERTY — This refers to the interests, benefits, and rights inherent in the ownership of the physical real estate. It is the bundle of rights with which the ownership of real estate is endowed [footnote omitted]. In some states, this term, as defined by statute, is synonymous with real estate. Does not include personal property. [American Institute of Real Estate Appraisers *502 and Society of Real Estate Appraisers, Real Estate Appraisal Terminology (1975), at 171-172]
In New Jersey the Legislature has consistently used the term “real property” rather than “real estate” in the statutes dealing with the local tax involved in this proceeding. Local property tax assessments are made each year on all real property in this State not expressly exempted from tax. N.J.S.A. 54:4-1. All real property is assessed to the person owning it on October 1 of the pretax year. N.J.S.A. 54:4-23. Moreover, an assessment must be made on “the full and fair value” of each such parcel of real property. Ibid. This applies irrespective of varied ownership interests; the assessment must be on the value of all interests in the property. Secaucus v. Damsil, Inc., 120 N.J.Super. 470, 295 A.2d 8 (App.Div.1972), certif. den. 62 N.J. 90, 299 A.2d 88 (1972); Merchandise Mart Associates v. Pennsauken, 3 N.J.Tax 275, 282-283 (Tax Ct.1981); Wayne Mall, Inc. v. Wayne Tp., 2 N.J.Tax 1, 19 (Tax Ct.1980).
It is clear from these propositions that the assessment on Quaker Bridge Mall should be based on the entirety of the taxable real property. The assessment should not be limited to plaintiff’s fee simple interest and it should not be limited to the structural shells of the department stores and the Mall stores as described above.
A second and related aspect of the question of what property is taxable specifically involves plaintiff’s operating agreement (the “constitution” of the shopping center) and the “merchandising mix” and “marketing package” that plaintiff has put into effect at Quaker Bridge. Plaintiff states that these intangible rights “create extraordinary increments of value” which benefit it in the form of more profitable minimum and overage rents from its tenants than would otherwise be attainable. Plaintiff contends that profits realized in the form of enhanced rents, and ultimately from any sale on the Quaker Bridge Mall complex, are not properly the subject of a tax on real property because the additional value results from its business acumen rather than from its land and improvements.
*503 It is true that less income (and thus less value) would result if the same amount of square footage were leased to tenants of less diversity and lesser quality than plaintiff’s and if a markedly less extensive merchandising effort were undertaken than exists at Quaker Bridge Mall. It is also undoubtedly true that decisions made by plaintiff regarding the size, configuration and overall design of the shopping center have led to enhanced rents, as plaintiff hoped they would. However, it is also beyond dispute that management expertise generally varies from property to property throughout any taxing district and that fundamental appraisal principles deal with these disparities.
The first such principle is that a property must be valued at its highest, best and most profitable use. Inmar Associates, Inc. v. Edison Tp., 2 N.J.Tax 59, 64-65 (Tax Ct.1980); The Appraisal of Real Estate, supra at 43-45. The parties in this ease accept the premise that a super regional shopping center is the highest, best and most profitable use of the subject property. Expert management of the kind provided by plaintiff is essential to such a sophisticated use. If the income potential of Quaker Bridge Mall were not being realized as a result of inadequate management the court might well have to adjust for this by adding a factor to the actual or contract rents received from plaintiff’s tenants. This involves a second fundamental appraisal principle: that “economic” rent or income must be used in the capitalized income approach to the valuation of property if economic rent differs from actual rent. Parkview Village Associates v. Collingswood, 62 N.J. 21, 29-30, 297 A.2d 842 (1972); New Brunswick v. Div. Tax Appeals, 39 N.J. 537, 544, 189 A.2d 702 (1963).
A finding of economic rent is dependent on the proofs adduced by the experts. Cf. Korvettes Home Furnishing Center v. Elmwood Park, 1 N.J.Tax 287 (Tax Ct.1980). If a finding could be made that a particular property generates a level of extraordinary income from extraordinary management such that the capitalized stream of that income is indicative of more than the value of the real property, the finding would have to be *504 based on an analysis of the property’s actual income contrasted with economic rent for comparable properties. For this reason there could be no preliminary finding that some portion of Quaker Bridge Mall income is enhanced rent that must be discounted in the income approach on the grounds that it is reflective of plaintiff’s business acumen rather than the value of the subject property. The point is moot in any event because I have not used plaintiff’s minimum and average rents in the income approach discussed below.
B. Real Property v. Business Personal Property
Another major dispute between the parties is the extent to which certain department store and tenant improvements are taxable by Lawrence Township as real property or not taxable because they constitute business personal property. Plaintiff’s contention is that most of the items of tenant finishes are in the nature of decorative or marketing aids and that in any event they are not load-bearing or structural components of the real estate. Plaintiff contends that the tenant finishes may be easily removed without any substantial damage being done to the underlying realty. Plaintiff’s witnesses testified, for example, that a typical tenant’s storefront could be dismantled by a single worker in less than a full day. Furthermore, it was established at trial based on tenant turnovers at the Mall since its opening in 1976, that there has been no significant increase in the rental value of any specific shop and there has been no pattern of transfer payments by any new merchants attributable to tenant finishes. The conclusion plaintiff would draw from these facts is that tenant finishes do not contribute value to the freehold but are of value only to the department stores and merchants in their respective shops.
The types of improvements and their treatment by the experts may be summarized very briefly in this manner:
*505 Agreed to Be Real Estate
fluorescent lighting for general illumination of department stores [6]
concrete floor slab
demising strips and covering drywall
plumbing and electrical hookups
ductwork and air handler for HVAC
sprinkler mains
Disputed
lighting fixtures for general illumination of retail shops [6]
interior partitions covered with painted sheetrock, panelling or other wall coverings
ceramic tile and other floor coverings
dropped ceilings with acoustical tile
raised flooring
storefronts
“high hat,” track and other accent lighting to display merchandise
toilets and sinks
Agreed to Be Personal Property
inventory and merchandise
chairs and furnishings
mannequins
showcase cabinets
display tracks
cash registers
This court recently examined the law of New Jersey pertaining to the taxation of real property as distinct from business personal property in Sta-Seal, Inc. v. Taxation Div. Director, 5 *506 N.J.Tax 272 (Tax Ct.1983). In that case the court followed and applied the holding in Bayonne v. Port Jersey Corporation, 79 N.J. 367, 399 A.2d 649 (1979). Sta-Seal involved the taxability of a very large metal structure, used for the production of asphalt, which was bolted to concrete piers. Bayonne dealt with one-million pound cranes that rested on railroad rails fastened onto concrete pilings. In the latter case the Supreme Court held that the cranes were not taxable as real estate because they could be removed without irreparable or serious physical injury to the freehold. In Sta-Seal this court held that most of the components of the asphalt plant were taxable as business personal property because they could be removed from their foundations without significant injury of any kind. However, the concrete piers and slabs and the steel and wood piles on which the piers were constructed were held to be taxable improvements to real estate because they were invariably destroyed in the process of removal from the ground.
The basis for the legal analysis required in the present case with respect to the list of items of business property previously set forth is implicit in the opinion of the Supreme Court in Bayonne. The result in that case was that the municipality could not tax the cranes as realty pursuant to N.J.S.A. 54:4-1 because the cranes were subject to the State business personal property tax imposed by N.J.S.A. 54:11A-1 et seq. The cranes were subject to and not exempt from the State tax on personal property used in business because they were not “goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto; ...” N.J.S.A. 54:llA-2(b)(2). If the cranes had not been taxable as business personal property it is clear that they would have been taxable as real property. This is also true for the disputed property in the present case.
In the Bayonne opinion the court observed that the language in N.J.S.A. 54:11A-2(b)(2) had been derived from certain sections of the Uniform Conditional Sales Act and it therefore concluded that the prior interpretation given to these words had *507 to be examined in construing the present statute. According to the court:
The meaning that the phrase “material injury” had been given in the great majority of those states which had adopted the Uniform Conditional Sales Act [7] was a test of irreparable or serious physical damage. “Serious physical damage to the property was interpreted as removal of something essential to its support.” 5 Powell on Real Property, § 660.2 at 96.15 (1977). “[Ajnything could be removed unless the removal, in effect, destroyed the structure.” 2 G. Gilmore, Security Interests in Personal Property, supra, § 30.2 at 804. We conclude, therefore, that the exclusion of
goods and chattels so affixed to real property as to become part thereof and not to be severable or removable without material injury thereto
appearing in N.J.S.A. 54:11A — 2 should, looking solely to the language of the statute, be taken to mean only those chattels the removal of which will do irreparable or serious physical injury or damage to the freehold. [79 N.J. at 377-378, 399 A.2d 649]
Several early New Jersey cases construing the Conditional Sales Act appear to be the most helpful in providing further guidelines for determining what constitutes “irreparable or serious physical injury or damage to the freehold.” These cases did not adhere to the “institutional doctrine” rejected in Bayonne. Rather, they applied the statutory language in a way consistent with the majority of states and I consider the opinions below to be viable for purposes of current statutory construction.
The most analytical and instructive of these cases is Bank of America National Assoc. v. La Reine Hotel Corp., 108 N.J.Eq. 567, 156 A. 28 (Ch.1931). In that case numerous conditional vendors sought to remove property they had sold to a hotel under conditional sales agreements. The hotel had become insolvent and was placed in the custody of a receiver. The court had to determine with respect to each item of property whether its removal would cause material injury to the freehold. The court found that the removal of one large canopy, five refrigera *508 tors, an oven and a mixing machine were personal property because they could be removed from the building by loosening certain bolts and nuts and by disconnecting certain pipes, joints and electrical connections. Id. at 581, 156 A. 28. A large storage refrigerator, removable only by disconnecting electrical connections, removing its doors and cutting certain concrete and cork covering, was also considered personal property removable without material injury to the freehold. The court noted in this instance that the expense of the necessary repairs would be approximately $6 and that the refrigerator had been installed at a cost of $2,500, thus at least implying that de minimus injury in terms of cost of repair was not “material injury” within the intent of the statute. Ibid. The court also found that a self-contained refrigerator unit, transformers detachable by loosening screw connections, stored window and door screens, and chairs and tables were removable without material injury to the freehold and therefore could be removed by the conditional sellers. Ibid.
Other early Chancery cases dealing with specific factual circumstances in the context of the material injury test without application of the institutional doctrine were Sellito v. Heating and Plumbing Finance Co., 116 N.J.Eq. 247, 174 A. 147 (Ch. 1934), and Manufacturers Building and Loan Assoc. v. Public Service Electric & Gas Co., 106 N.J.Eq. 68, 150 A. 196 (Ch.1930). In Sellito a heating system consisting of a boiler erected under the ground floor of a building and pipes running under and through the floor connecting to radiators was considered personal property. In order to install the boiler a hole had been opened in the main floor of the building and a “pit” had been dug out with compressed air hammers and dynamite charges. This had been necessary because the building rested on solid rock in the region of the Palisades and had no basement. Id. 116 N.J.Eq. at 250, 174 A. 147. The pit was lined with concrete, the boiler was lowered by means of a block and fall, piece by piece, and was assembled. The boiler was then connected to feed lines which ran under the floor of the building and through holes cut in the floor to radiators at various points throughout *509 the building. Id. at 251, 174 A. 147. Despite the attachment of the boiler to the pipes and radiators the court relied on the “undisputed testimony of the defendant’s experts” to find that the heating system was removable without material or permanent injury to the building. Id. at 252-253, 174 A. 147. The defendant’s experts explained that to remove the boiler they could enter the pit by a trap door, dismantle the boiler and remove it section by section out the trap door either by means of a mounted snatchblock or by manpower alone. The main steam lines under the building could be removed through the trap door once they were loosened from the feed lines. The risers, once loosened from the feed lines, could be easily removed even though located in some instances behind plaster walls that were set up after the risers were installed. In short, all parts of the system could be removed, leaving only the holes in the floor through which the main steam pipes and feed lines ran. The holes left in the floor were not considered material injury to the premises and the conditional seller was allowed to remove the heating system. Ibid.
Manufacturers Building and Loan Assoc. involved a bill to enjoin defendant from removing refrigeration compressors, motors and “ice boxes.” The conditional sales agreement covering the refrigeration equipment had provided for installation of compressors, freezing coils and refrigerators but it had expressly excluded the installation of electric wiring, conduit and outlet boxes. The court observed that “[T]his seems to exclude anything that would damage the freehold [upon removal].” The court also found that the conditional sales agreement provided that “in the installation of the equipment, there shall be no permanent attachment thereof to the realty, but they shall be so attached by movable screw joints or otherwise, so as to be easily severable without material injury to the freehold.” 106 N.J.Eq. at 69, 150 A. 196. The court found as a fact that the refrigeration equipment could be removed without injury to the freehold.
One last case is helpful, although it was decided under a predecessor of the Uniform Conditional Sales Act. General Electric Co. v. Transit Equipment Co., 57 N.J.Eq. 460, 42 A. 101 *510 (Ch.1898), involved an action by General Electric to enforce its title to certain trolley car apparatus sold under a conditional sales agreement and placed on cars of the Union Traction Company. The apparatus consisted mainly of motors attached to the “running-gears” of each car, the “controller” attached at each end of a ear and the trolley poles on the tops of the cars. Various defendants objected to plaintiffs action on the grounds that the articles sold by General Electric had been so mingled with other property of the Union Traction Company that they could not be separated from such other property. The court’s analysis in not sustaining the objection is enlightening, even though the concept of “material injury to the freehold” was not involved because the trolley cars were not real property:
The trucks and bodies of the railway cars were originally made and designed to be propelled by electricity, and by apparatus of the kind here provided by the electric company. No particular alteration or cutting was required in order to attach the apparatus provided by the electric company to those cars, and the articles so furnished are each still distinct and may be removed. The essential quality of neither the motor nor controllers on the cars is changed by the annexation, and when removed each will have its own distinct existence and quality. The motors and controllers are of a standard make, such as may be applied to any street railway car, and their removal will leave the street railway cars and trucks ready and fit to receive other equipments of the same character and of the same value in all respects as if they had never been attached. I see no substantial difficulty in removing them, [at 465, 42 A. 101]
A number of important points may be abstracted from these cases. First, it is clear that our Supreme Court in the Bayonne case found that the Legislature in enacting the Business Personal Property Tax Act established a preference for taxing business property as business personal property whenever it could be justified under the statutory language. According to the court, the effect of the act was to tax business equipment and machinery uniformly at the state level, eliminating disparities in local taxation and taxing the property at a generally lower rate. 79 N.J. at 378-379, 399 A.2d 649. The intent of this change was “to create in New Jersey a fiscal climate that will contribute to the attraction of industry.” Id. at 380, 399 A.2d 649.
This is not to say, of course, that the Legislature intended to classify all business property as personal. Even though one might argue that even the bricks in a brick house could be *511 removed without material injury to the freehold, this was not envisioned by the draftsmen of the Uniform Conditional Sales Act. In their words “material injury to the freehold” upon removal of an object was established to be the test of when an object had such close attachment to or incorporation into the land that it had lost its identity as personal property. The draftsmen specifically said that it would be “unreasonable” to expect a purchaser of land to look for a conditional sale contract reserving title to the seller in “bricks built into a house.” 2A Uniform Laws Annotated, § 66 at 99. In other words, once a brick has been incorporated into the wall of a house, it no longer has an identity as a brick as such but rather is merely one of the components of a brick wall or a brick house.[8]
Another limitation to the contention that virtually any item could be removed from an improvement without material injury to the freehold is that the term “freehold” is inclusive of many items that had at one time been personal property. “Freehold” does not mean “land.” In Bank of America National Assoc. v. La Reine Hotel Corp., supra, the question was raised, in a determination concerning injury to the freehold upon removal of a chattel, whether the word “freehold” refers to the freehold as it existed before or after the annexation of the chattel. The court concluded that the term as used in the Conditional Sales Act referred to the freehold as it stood at the time the inquiry was made. The court held:
Where, therefore, the disputed chattel consists of a detachable functional unit, or of any chattel which by annexation has not lost its identity, and is consequently separable without injury either to the freehold or to the chattel itself, the word “freehold” is exclusive of such chattel. But where the personal property is so incorporated into the realty as to lose its identity, and consequently not separable without material injury, then the word “freehold” is inclusive of that *512 property because it is no longer personalty but has been absorbed and become a part of the realty. [108 N.J.Eq. at 578, 156 A. 28]
Under the court’s reasoning in that case, goods that have been annexed in such a way as to lose their identity, and have consequently become inseparable without material injury to the freehold at the time the inquiry is made, are themselves considered part of the freehold and damage to such goods would constitute damage to the freehold.
This was also the holding in Sta-Seal, Inc. v. Taxation Div. Director, supra, in which steel and wood piles were held to be taxable as real property because they were destroyed when removed. As one commentator who was quoted in Sta-Seal observed, those things which become realty as a matter of law “either by virtue of the nature of the goods or chattels or by virtue of the manner of annexation” are those described in the following language:
Where fixtures or articles, though originally personalty in nature, are attached to or become a part of the building or lands in such a manner that they may not be detached without themselves being destroyed or materially Injured, or are so incorporated into a building that the removal thereof will affect the security of the building itself or a substantial part thereof, the character of such fixtures or articles as personal property is finally ended. [5 N.J.Tax at 287; emphasis supplied]
Another aspect of the holding in Sta-Seal is particularly important to the present case: the intent or agreement of the parties is irrelevant. Whether any chattel is realty or personalty for business tax purposes should be determined solely on the basis of how it is attached to the business real property. Id. at 288-289.
The various types of department store and tenant finishes must be considered within the standards set forth above. Certain items of business property never lose their identity as functional units and can be removed simply by the unfastening of wires or bolts without damage of any kind. They are therefore business personal property rather than real property. This would include all light fixtures for general illumination (including fluorescent lights in the department stores which the experts treated as real property) as well as toilets and free *513 standing sinks. The various kinds of “high hat,” track and accent lighting, although perhaps not all functional units, may also be removed without injury of any kind except perhaps small holes in the wall from screws that had been used to support the tracks. This kind of damage can easily be repaired, is de minimus and does not constitute material injury. Such items are therefore business personal property and are not taxable by the municipality.
Movable interior partitions in the department stores that are not attached to the floor or the ceiling are clearly personal property. Wall coverings on such partitions, even though they would be destroyed upon removal, would thus also remain personal property because they are affixed only to personal property and are not in any way affixed to real property. However, partitions constructed of studs and sheet-rock that are anchored to the floor and ceiling could not be removed without damage to themselves and to their wall coverings and they would be taxable real property. Similarly, ceramic tile and other floor coverings would be damaged or destroyed on removal, could not be and in fact are not used again and therefore must be considered real property for local real property tax purposes.
The raised flooring installed by department stores and tenants for display purposes is part of the real property itself if it cannot be removed without serious physical damage either to the raised flooring or to the original flooring or walls. For example, when raised flooring is cemented or attached in such a manner that either it or the underlying floor must be damaged to remove the raised flooring, it is part of the realty. When the flooring is attached in such a manner that removal would result only in a small number of screw holes or nail holes being left in the floor or walls the flooring should be considered personal property.
The metal frames for dropped ceilings are cut to size and are made of malleable metal. They are invariably destroyed upon removal. The acoustical tile panels in a dropped *514 ceiling are very likely to be damaged on removal and are almost never used again. Such dropped ceilings, therefore, should be treated for assessment purposes as taxable real property.
The tenants’ storefronts are perhaps the most expensive of the disputed items. Plaintiff’s contention that these are personal property was based in large part on its proofs that the storefronts could be removed without damage to plaintiff’s structural concrete shell. This was plaintiff’s contention even if sledgehammers had to be used to knock out the storefronts. Plaintiff also argued that the storefronts were intended to be decorative marketing aids unique to each tenant and of no value to the real property. However, as discussed above, damage to the structural shell is not the test. Moreover, the intent of the parties and the use of the storefronts are not relevant. Any storefront that must be removed with a sledgehammer would itself be damaged and would thus be real property. According to the proofs in this ease most storefronts are firmly attached to the real property and could not be removed without being damaged. Certainly the storefronts are not functional units that may be removed and used elsewhere. I find, therefore, that the Mall storefronts are real property rather than personal property for business tax purposes.
All of the above is obviously said in the context of the present case. Proofs could vary in other cases. However, it is not likely that appraisers or tax assessors will focus to any great extent on individual items of business property in the usual valuation situation; nor should they. In most circumstances it would not much matter whether something like a dropped ceiling were treated as real property or as personal property because the increment of value typically attributable to such an item would be relatively nominal. This will become apparent even in the present case in the discussion below on the reproduction cost approach to value. The court is mindful that local property taxation is in many ways a very practical undertaking. Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax 486, 506-507 (Tax Ct.1982). The ultimate objective is a uniformity of treat *515 ment among taxpayers so that the heavy burden of local property taxation is shared equitably and no one taxpayer bears a disproportionate part of the burden. The parameters discussed in this portion of the opinion are intended to promote this objective.

C. Route 1 Overpass

The last dispute over what property is taxable involves the overpass plaintiff constructed over Route 1. This allows traffic from the subject property to exit onto Route 1 south without delay and it allows traffic on Route 1 south to exit from and cross over the highway into the Mall’s ring road and parking lot. After plaintiff had obtained a zoning change to permit construction of a regional shopping center, the State Department of Transportation approved the construction by plaintiff of a jughandle and a “cut through” across Route 1 to accomplish the same result as was later achieved with the overpass. Plaintiff undertook the more costly improvement on its own instead of the jughandle and cut-through because plaintiff was concerned that traffic bottlenecks would otherwise develop on Route 1 and make entry and exit to Quaker Bridge Mall less convenient.
Plaintiff advances three reasons why the costs of construction of the overpass should not be considered in determining the assessment on the subject property. First, plaintiff states that the overpass is not situated on either of the properties involved in this appeal and thus did not represent a cost of those properties. This argument is a bit elusive, for the overpass goes from one of plaintiff’s two tracts to the other and it was certainly a cost incurred by plaintiff in the development of its property. It is true that much of the overpass is physically over Route 1, a public way, and it is unclear from the proofs exactly where the foundations of the overpass are located. Nonetheless, the structure does not belong to the State or local government and it must be assessed to its owner because it is not exempted by statute. Cf. Brick Stores, Inc. v. Bridgewater Tp., 4 N.J. Tax 412, 416 (Tax Ct.1982).
*516 Plaintiff next argues that the overpass should not be assessed because it was constructed only to improve access to the Mall and was really unnecessary “because the New Jersey Department of Transportation had approved a much less costly plan to accomplish the connection.” No authority is cited to support this contention and it makes no sense. The fact remains that the overpass was constructed, it has value, it is owned by plaintiff and it must carry its proportionate share of the local real property tax burden.
Plaintiff’s third argument regarding the overpass is that it is in the nature of a public improvement because it permits a freer flow of traffic than the State’s plan for a jughandle would have permitted. This is undoubtedly so. It is also undoubtedly true that plaintiff could have developed its real estate in additional ways to increase or improve access to Quaker Bridge Mall but this would neither make such improvements public property nor entitle their owner to an exemption for the improvements in the absence of a clear statutory provision. Cf. Brick Stores, Inc. v. Bridgewater Tp., supra. Accordingly, the cost of construction of plaintiff’s overpass will be considered in the process of determining the true value of the subject property. This will be especially relevant in the context of the reproduction cost approach.

True Value

Reproduction Cost Approach

A. Land Value

An essential aspect of the cost approach is the determination of land value. The means used to determine this value is a straightforward market approach:
... it should be emphasized that land value is not the historic cost of the land or the acquisition price plus the expense of making it usable through the addition of underground or other'improvements. The land value component of the cost approach does not reflect an original cost-to-create or cost-to-acquire concept, but is estimated whenever possible on the basis of current selling prices of comparable sites and other pertinent market data. It is this estimated market value of the land that is added to the depreciated cost of the improvements in this approach. [The Appraisal of Real Estate, supra at 264-265]
*517 The amount of land to be valued at the Quaker Bridge Mall site (Block 47, Lot 5) is 85.47 acres as of October 1,1975 and May 1, 1976,[9] and 70.12 acres as of October 1, 1976 and October 1, 1977. The remainder of the land in the total 100-acre tract at the Quaker Bridge Mall (the J.C. Penney and Sears parcels) is not at issue in this proceeding. In addition, the 3.38 acres known as Block 45, Lot 51 must be valued as of October 1, 1976 and October 1,1977. For the specified assessing dates, the three appraisal experts valued the raw land at the Mall site on a per-acre basis as follows:
Oct. 1,1975
May 1,1976
Oct. 1,1976
Oct. 1,1977
Plaintiff’s
Expert
$40,000
$40,000
$40,000
$40,000
Defendant’s Experts 1 and 2
$75,000 $45,000
$80,000 $80,000
$85,000 $83,500
$100,000 $92,500
Thus, the experts’ opinions regarding the aggregate value of the 70.12-acre portion of the property ranged from plaintiff’s low of $2,804,800 for all relevant dates to one municipal expert’s figure of $5,259,000 as of October 1, 1975 and $7,012,000 as of October 1, 1977. It is obvious from these figures that land value is a significant component of total value in the cost approach.
One serious deficiency in the position of plaintiff’s expert is readily apparent: he offers no explanation for the lack of any adjustment to his land value from October 1, 1975 through October 1, 1977. The report of plaintiff’s expert did not mention the subject of inflation during this time and it was also silent on the impact of the significantly improved access to the subject property resulting from the completion of plaintiff’s overpass between the assessing dates of October 1, 1975 and May 1, 1976. Although it is not uncommon for appraisers to *518 arrive at a single value determination for a period of years, each annual assessment is a separate entity. Rodwood Gardens, Inc. v. Summit, 188 N.J.Super. 34, 38, 455 A.2d 1136 (App.Div.1982). The proofs in the present case require separate value conclusions for the separate assessing dates. See Lamm Associates v. West Caldwell, 1 N.J. Tax 373, 385-387 (Tax Ct.1980). This is especially pertinent because of the magnitude of the assessment in this case. A value change from one year to the next in this matter could be on the order of millions of dollars.
Plaintiffs land value analysis had other shortcomings. Plaintiff’s expert summarized acquisition costs of the subject site in 1969 and 1970 and sales of portions of the site to J.C. Penney in December 1974 and to Sears in January 1976. Although the expert relied on the acquisition of the land by Macy’s in 1969-1970 at $10,350 an acre, he did not deal with the sale by Macy’s of the same land to Lawrence Associates in 1973 for $6,660,000. Since this was then a 100-aere tract, the 1973 transaction might be said to have reflected a purchase price of $66,600 an acre. An officer of Kravco, Inc. testified, although not as an appraisal expert, that the later acquisition could be construed in several ways, at $56,000 an acre, $50,000 an acre or $45,000 an acre, depending on the analysis used. Suffice it to say that plaintiff’s appraiser used no analysis at all in connection with this transaction and, moreover, failed to state why he gave the sale no weight.
Plaintiff’s expert used the sales of portions of the subject property to J.C. Penney and Sears as comparable sales, reflecting sales prices per acre of $32,100 and $39,100, respectively. However, he made no effort to use these two sales for purposes of analyzing any upward trend in the value of the subject property from December 1974 to January 1976. Since both sales were from the very tract involved in this proceeding the sales would seem to reflect a 20% annual appreciation factor.[10] If *519 such an adjustment were made it would have a major impact on plaintiffs conclusion regarding land value from October 1, 1975 through October 1, 1977 and plaintiffs expert should have addressed this point.
Nor did plaintiffs expert consider whether the latter two sales were fully indicative of market value or were discounted as an inducement to the major department stores to locate at the Mall. The official from Kraveo (a developer of major shopping centers) testified that sales of land by developers to department stores are always at a discount from market value. In his opinion if such subsidies were disregarded the sales to J.C. Penney and Sears would reflect prices of $45,000 an acre rather than $32,100 and $39,100. The failure of plaintiff’s appraiser to take the subsidy factor into account reflects negatively on his land value analysis.
The only remaining basis for plaintiff’s land value opinion consisted of developers’ acquisition costs for raw land for two recently constructed regional malls in South Jersey. One of these transactions was for the acquisition of the Deptford Mall site in Deptford Township, Gloucester County, and the other was for the Ocean County Mall site in Toms River, Ocean County. The appraiser testified that he used these land sales as comparables because they were acquired for comparable real estate development in New Jersey during the general time period in question in this proceeding. Such reasoning would mean that any residential building lot in the state could be used as a comparable for any other residential building lot in the state no matter where they were located with respect to each other. This, of course, is clearly wrong. For example, Deptford is in the Philadelphia-Camden metropolitan area. On a State Department of Transportation map it is 38 miles from Quaker Bridge Mall on a direct line. Toms River is on the far side of the state near Barnegat Bay and the Atlantic Ocean. It is 34 miles from the subject property. Plaintiff’s proposed comparables are not only in different municipalities and different counties than the subject property, but they are also in entirely *520 different areas of the state. In fact, none of the three properties is in the same market because developers of super regional shopping centers intentionally locate in areas not already serviced by such a facility. In short, it is impossible from plaintiff’s proofs to determine whether the sale prices for the Dept-ford and Toms River properties are in any way applicable to Quaker Bridge Mall and they cannot be relied on in any meaningful way to value the subject property. Berkeley Development Co. v. Berkeley Heights Tp., 2 N.J.Tax 438 (Tax Ct.1981); Inmar Associates, Inc. v. Edison Tp., 2 N.J.Tax 59 (Tax Ct.1980); Fourth Fairland, Inc. v. Hazlet Tp., 1 N.J.Tax 254, 260 (Tax Ct.1980). See Sunshine Biscuits, Inc. v. Sayreville, supra, 4 N.J.Tax at 496.
A point can be made, nonetheless, from plaintiff’s use of the two comparables. According to plaintiff’s expert the Dept-ford tract was acquired in 1974 for $44,660 an acre and the Toms River tract was acquired in 1973 for $37,500 an acre. The expert noted but did not use as comparables later sales by the developers of portions of each of these tracts to department stores. Each department store sale was for a price per acre less than the original acquisition cost. From the Deptford tract, land purchased for $44,660 an acre was sold in the same year to Macy’s for $21,520 an acre and to Wanamaker for $30,800 an acre. Each department store also obtained an interest in additional land for the same consideration. From the Toms River tract, land purchased in 1973 for $37,500 an acre was sold in 1975 to Sears for $26,700 an acre and to Macy’s for $23,900 an acre. At the very least these transactions support the conclusion that sales by developers to department stores are at subsidized prices and for that reason are not indicative of market value. Cf. Almax Builders, Inc. v. Perth Amboy, 1 N.J.Tax 31, 38-39 (Tax Ct.1980).
This point is significant because plaintiff’s expert apparently relied very heavily on the sales of portions of the Quaker Bridge Mall site in 1974 and 1976 by plaintiff to J.C. Penney and Sears at $32,100 and $39,100 an acre, respectively. Since these sale *521 prices were subsidized, and since Kravco’s officer estimated that the J.C. Penney sale would have reflected a value of $45,000 an acre in 1974 without subsidy, the opinion of plaintiff’s expert that the raw land at the Quaker Bridge site was worth only $40,000 an acre through October 1, 1977 cannot be accepted.
Lawrence Township’s first expert employed a sounder approach to determine the value of raw land at the Quaker Bridge site. He presented a neighborhood analysis that traced the history of the planning and development of the Mall from 1968 through 1976. This analysis discussed the zoning change in April 1969 to permit construction of a shopping center, litigation with a competitor over the zoning change, site approval for and then the construction of the Quaker Bridge Mall. In the opinion of this expert, commercial land values in the immediate vicinity of the Mall increased from $10,000 an acre in 1968 to $125,000 an acre by the time the Mall was built in 1976. Although the expert found no comparable or substitute site in Lawrence Township because zoning restrictions preclude the development there of any other super regional shopping center, giving the subject property “a unique and monopolistic competitive edge,” he supported his opinion with an examination of 12 sales of commercial property from 1968 through 1978. All the properties were in Lawrence Township and 11 were on Route 1. The twelfth property was on a Route 1 exit road, off the highway only 320 feet. Sales such as these in the same taxing district, on the same highway and in the neighborhood of the subject property offer a good indication of the value of the subject property, assuming comparability in other respects. These sales establish without any question that the trend of real estate values was up during the years at issue, a point overlooked by plaintiff’s expert. One of these sales reflected as early as 1970, the year following the zoning change, that property values were increasing dramatically for sites adjacent to the Mall site. This sale was for $125,000 an acre contingent on construction of the Mall. As explained by defendant’s expert, this demonstrates the enhanced value created by the fact that even as of 1970 it was or soon would be feasible “legally, physically and economically” *522 to build a super regional shopping center on the subject property-
Plaintiff contends that it should not be penalized in the form of a higher tax assessment because of value it created, but that contention ignores the purpose of an ad valorem property tax: it raises revenue from assessments on real property in direct relationship to property values. The proofs in this matter establish that the value of the entire area increased because of the location there of the Quaker Bridge Mall. That value must be reflected in the assessment on the Mall itself.
A potential limitation in the land value approach of defendant’s first expert is that the comparable sales upon which he relied were of very small lots compared to the Quaker Bridge tract. Aside from portions of the Mall site which he included among his 12 properties, the expert’s comparable sales were of parcels ranging from 1.0 acre to 4.66 acres. These sales amply demonstrate the value of Route 1 commercial frontage in Lawrence Township during the tax years 1976 through 1978, but they are not necessarily indicative of the value of the whole of the subject property. Smaller lots are generally considered to be more valuable on a unit basis than larger lots. Defendant’s first expert in fact discounted the results of his sales analysis to take this into account but his adjustment was necessarily subjective. The court is persuaded nonetheless that the “unique and monopolistic competitive edge” of the Quaker Bridge tract resulting from zoning restrictions created greater value per acre for that large tract to offset the typically higher value per acre of smaller parcels suitable for construction of strip shopping centers and individual highway stores. For this reason, I will accept the use of the smaller properties as comparable sales for purposes of determining the raw land value of the subject property.
Defendant’s first expert did not in so many words express an opinion as to the rate of inflation or appreciation applicable to the subject property from October 1, 1975 through October 1, 1977. However, the expert’s stated value conclusions on an *523 acreage basis reflect increases of 13% from 1976 to 1977 and 17% from 1977 to 1978. These percentage increases might be high if they reflected only inflation, but in this case they also represent appreciation attributable to the dramatically enhanced stature of the site as the focal point for commercial activity in Lawrence Township and surrounding communities. Being mindful of this, I conclude that the land values adopted by defendant’s first expert are a reasonable indication of the value of the land portion of the Quaker Bridge Mall for the respective dates.
Lawrence Township’s second appraiser also offered an opinion of raw land value at the Quaker Bridge site, but his analysis suffers from essentially the same deficiencies as did the opinion of plaintiff’s expert. The township’s expert considered as com-parables some sales of land purchased for regional shopping malls and some sales to department stores within the malls. He used six sales from a number of different counties in Pennsylvania and three New Jersey sales, the two used by plaintiff’s expert and one near Asbury Park on the North Jersey Shore, completely across the state from the Quaker Bridge site. The expert made no attempt to demonstrate the comparability of his sites to the subject property. I am unable to find any such comparability and I therefore attribute no weight to this expert’s opinion regarding raw land value.
For the reasons discussed above, I find the opinion of the township’s first expert to be persuasive on the issue of raw land value and I will adopt his per acre values. These were $75,000, $80,000, $85,000 and $100,000 for the four assessing dates set forth below. Application of these values to the tract of 85.47 acres for the first two dates and to the tract of 70.12 acres for the latter two dates produces the following raw land values, which I will use in determining the true value of the subject property:
*524 Oct. 1,1975
May 1,1976[11]
Oct. 1,1976
Oct. 1,1977
$6,410,250
$6,837,600
$5,960,200
$7,012,000
Application of these values to the 3.38 acre tract known as Block 45, Lot 51 produces the following raw land values for the assessing dates under appeal:
Raw Land Value
Oct. 1,1976 $287,300
Oct. 1, 1977 $338,000
After coming to conclusions with respect to raw land value, two of the experts (plaintiff’s appraiser and defendant’s second appraiser) studied site improvement costs to determine the extent of any incremental value attributable to the land as a result of such improvements. Both experts followed the same approach and arrived at essentially the same conclusion. They compiled actual costs as of October 1, 1975, May 1, 1976 and October 1, 1976[12] for the following items relating to site improvements: clearing, grading and excavating; location or relocation of utility lines; installation of water mains and storm and sanitary sewer lines; erosion control; landscaping; “general conditions” (temporary and miscellaneous construction), and interest charges. Plaintiff’s expert presented an itemization of these costs and the court accepts them as reasonable. Both experts concluded that the effect of the specified site improvements added to the value of the land. Although they differed slightly in the details of their conclusions, the differences are inconsequential. Based on the opinions of both experts I conclude that site improvements added the following amounts of land value to the Quaker Bridge Mall site:
*525 Site Improvement Value Per Acre
Oct. 1,1975
May 1,1976
Oct. 1,1976
Oct. 1,1977
$28,000
$33,500
$33,500[13]
$19,000
These figures when applied to 85.47 acres for the first two assessing dates and to 70.12 acres for the latter two assessing dates produce the following increments in value:
Oct. 1,1975
May 1,1976
Oct. 1,1976
Oct. 1,1977
Site Improvement Value
$1,623,900
$2,393,200
$2,349,000
$2,349,000
The experts did not deal specifically with site improvements that may have been made to the 3.38 acre parcel known as Block 45, Lot 51. However, this smaller lot was in fact developed at or about the same time as the main tract. It would appear that most of the same types of early site preparation had to have been involved for both parcels, although the smaller lot would not have had the later and more extensive site improvements such as parking lot pavement and site lighting discussed below in connection with improvement value. I will therefore add to raw land value the amount of $33,500 for each of the 3.38 acres of Block 45, Lot 51 to reflect the enhancement of its value from elementary site improvements. Application of $33,500 to 3.38 acres produces a site improvement value for the smaller lot of $113,200 as of the 1977 and 1978 assessing dates.
Based on the analysis set forth above, I conclude that the following figures represent total land value, including both raw *526 land and site improvement values, for the specified assessing dates, for the two separate lots:
Oct. 1,1975
May 1,1976 [14]
Oct. 1,1976
Oct. 1,1977
Land Value
Block 47, Lot 5
$8,034,200
$9,230,800
$8,309,200
$9,361,000
Block 45, Lot 41
$400,500
$451,200

B. Improvement Value

The value of the improvements at Quaker Bridge Mall must be added to land value to complete the reproduction cost approach. The experts for the taxpayer and the township presented basically different methodologies in support of their improvement values and they arrived at quite different conclusions. Both types of methodology used by the experts are generally accepted in the appraisal profession and the question to be resolved in this opinion is which of the methods is more appropriate in the present case for the valuation of the subject property. The two types of approach are referred to generally in the following passage as “comprehensive” and “shortcut”:
Comprehensive reproduction cost estimation requires preparation of a detailed inventory of the materials and equipment that comprise the improvements, followed by application of the current prices of similar materials, equipment, labor, overhead, and fees necessary to duplicate the property as of the appraisal date. Reproduction cost may be obtained in this way; but in actual practice it is more frequently derived by shortcut methods that are adequate, since the most competently prepared building-cost estimates are still subject to reasonable variation. [The Appraisal of Real Estate, supra at 216; emphasis supplied]
Plaintiff followed “the most comprehensive method” of estimating cost, sometimes known as the quantity survey method. Ibid. According to The Appraisal of Real Estate:
The most comprehensive method of cost estimating is the quantity survey method. In its strictest application, it is a repetition of the contractor’s original process of developing a bid figure. A quantity survey is computation of the quantity and quality of all materials used and of all categories of labor hours *527 required, to which unit cost figures are applied to arrive at a total cost estimate for materials and labor. To this are added estimates for other contractor costs such as permits, insurance, equipment rental, field office, supervision, and other overhead, plus a margin for profit.
Although still an estimate, the quantity survey is the most accurate and provable method of cost estimating. It produces a reproduction cost estimate in detail sufficient for any possible analysis, [at 216-217]
Through the testimony of the manager of joint ventures for Kravco, Inc., plaintiff placed in the record the actual construction cost data on which its appraiser drew to base his opinion of the value of the improvements. Itemized construction costs included the following items: sitework incidental to improvements [15] (paving, striping, fire mains and hydrants, site lighting, curbs and guard rails, sidewalks, fencing, traffic signs and manholes); basic structure or building shell (concrete slabs, roof, floor and walls); basic electrical and plumbing work; the central heating, ventilating and air conditioning (HVAC) plant and the system for distribution of hot and chilled water to the rear of tenant stores; interior finishing and decorating for the common areas of the Mall; general conditions (supervisory costs incurred by plaintiff), and certain tenant improvements (drywall, toilets, sprinklers, electrical work exclusive of fixtures and HYAC ductwork and air handlers). Plaintiff itemized also the following “soft costs”: architects’ fees; soil inspection and reports; concrete testing; surveys; market, traffic and environmental reports, and permits and local inspection fees. In addition, plaintiff set out its actual administrative costs: its developer’s fee to Kravco, Inc.; legal and accounting fees; builder’s risk and liability insurance premiums during construction and the salary of a job clerk. Finally, plaintiff included as part of its construction costs all interest and financing costs attributable to the improvements and all start-up costs and costs of its grand opening celebration. As of October 1, 1977[16] the total of these *528 figures, not all of which plaintiff concedes are includable for ad valorem tax purposes, was $15,885,000 exclusive of the two department stores. This figure is the equivalent of a cost of $29.18 a square foot of gross building area. Plaintiff’s expert concluded that the total reproduction cost values, using the same methodology, were $7,379,000 for the Bamberger’s store and $4,109,000 for the Hahne’s store. Thus, the overall value of the improvements using this approach, according to plaintiff’s expert, was $27,373,000.
To corroborate the cost data used by its appraiser, plaintiff retained the services of Wood & Tower, a cost estimating firm and a subsidiary of McGraw-Hill. Wood & Tower analyzed all relevant plans and specifications and physically inspected the property. From the plans and specifications, the firm identified and quantified each of the building components used in the improvements. It then applied data from its computer data bank regarding localized construction costs of the following types: material costs of the components, including applicable taxes; the prevailing wage rates and productivity for the relevant construction trades; overhead and profit of contractors and subcontractors; and insurance costs and taxes. As an illustration of how the cost estimation was done, the largest entry in Wood & Tower’s system-component analysis for the Mall was $2,411,900 for 2,945 tons of structural steel columns, beams and girders at $818.98 a ton. The smallest entry appears to have been $10 for 70 linear feet of # 12 wire at $.14 a foot. From many pages of such computer-tabulated data, Wood & Tower derived construction cost estimates that were very close to the actual construction cost figures used by plaintiff’s appraiser.
Neither plaintiff’s appraiser nor Wood & Tower purported to include certain items in their cost figures: the cost of tenant finishes other than those mentioned above; the cost of the overpass constructed to improve access to the property ($1,600,- *529 000 including contractors’ and engineers’ fees); certain office equipment and carpeting; a Musac system; traffic signals; maintenance equipment and title fees and permanent loan fees.
Both of defendant’s appraisers used a different reproduction cost methodology. They used “comparative methods” of estimating reproduction cost rather than the “quantity survey method” used by plaintiff. Defendant’s methodology has been described briefly as follows:
The comparative methods derive a reproduction cost estimate in terms of dollars per square foot or per cubic foot based on known costs of similar structures, adjusted for time and physical differences. Indirect costs may be included in the unit cost or computed separately. If the benchmark property and the property being appraised are in different construction markets, an adjustment for location may also be in order.
These methods represent a relatively simple, practical approach to a cost estimate and are widely used for appraisal purposes. The unit-cost figures are in terms of gross building dimensions. Each is a method of estimating total cost by comparison with that of similar buildings, recently constructed, for which cost data is available in the appraiser’s files or through current construction market research. This data is reduced to a cost per square foot or per cubic foot of building content. Alternately, a unit-cost figure may be developed by using a recognized cost service. A unit cost computed in this manner provides confirmation of figures developed by the appraiser from specific examples in the local market. [The Appraisal of Real Estate, supra at 225]
Both of defendant’s appraisers used the Marshall Valuation Service, a recognized cost calculator service, in their work. Use of such a published service enables an appraiser to calculate his estimate of reproduction cost in a minimum amount of time. Once he has determined not only the appropriate building class and the overall quality of the subject property, but also which adjustments he must make to conform that property to the published base square foot or cubic foot cost for that type of improvement, the necessary mathematical computations can be done quickly on a calculator cost form provided by the valuation service. After setting forth the details of their analyses for the central portion of the Mall and for the department stores, defendant’s two appraisers arrived at reproduction cost conclusions as of October 1, 1977 (exclusive of site improvements, the value of the overpass and any factor for “entrepreneurial profit”), as follows:
*530 Expert 1 Expert 2
Mall
Bamberger’s
Hahne’s
Total
$36,665,000
11,037,000
6,317,605
$54,019,605
$28,632,958
10,468,345
6,406,970
$45,508,273
Obviously, these conclusions are considerably higher than those of plaintiff’s appraiser whose opinion of the total equivalent value for the subject property was $27,373,000.[17]
The differences in these conclusions of the experts for plaintiff and defendant can be largely accounted for in two areas of disagreement: (a) time, and (b) department store and tenant finishes. If these two factors had been treated consistently by the experts their conclusions regarding the value of the improvements by use of the reproduction cost approach would not have been nearly so dissimilar.
The time factor is very significant because the assessments at issue were made over a period of two full years. The first assessing date was October 1, 1975 and the last was October 1, 1977. Value determinations for assessment purposes must coincide with these assessing dates. The appraisal principle that is particularly relevant to the issue of time in the context of the reproduction cost approach is the principle of substitution. The Appraisal of Real Estate states that the principle of substitution is “basic” to the cost approach. It defines the term in this way:
... [N]o prudent person will pay more for a property than the amount for which he or she can obtain by purchase of a site and construction of a building without undue delay, a property of equal desirability and utility, [at 263-264; emphasis supplied]
According to the principle of substitution, a hypothetical prospective purchaser of the Quaker Bridge Mall on the assessing dates in question would have had to analyze what it would cost as of those specific dates to acquire a site of equal desirability and utility and to construct on it a super regional shopping *531 mall with two major department stores (exclusive of J.C. Penney and Sears) and 130 smaller retail spaces. It is inherent in this principle that the prospective purchaser would have had to estimate his costs as if he had begun the entire project on the assessing dates. This is so because a prospective purchaser would have had to determine as of those dates whether he could duplicate the property for less than it would cost to buy it.
Application of this test to value the Quaker Bridge Mall as of the assessing dates poses an unusual problem of determining appropriate cost figures. It would have been virtually impossible as of either October 1, 1975 or October 1, 1977, for example, to duplicate this property without “undue delay.” It took plaintiff and its predecessors at least eight years to plan and build Quaker Bridge Mall, from 1968 when Maey’s acquired options on vacant land until 1976 when construction of the shopping center was for the most part complete. This time frame does not include the planning time that preceded Macy’s decision to acquire this particular site. Plaintiff’s witness from Kravco, Inc. testified that a developer would ordinarily take seven years from the start of his land acquisition to the opening of a regional shopping center. The witness characterized the development of Quaker Bridge Mall from the formation of Lawrence Associates in January 1973 to the opening of the Mall in the spring of 1976 as “lightning fast” for such a project.
Since costs must be determined for purposes of the principle of substitution as if contract prices had been established on the assessing dates, the use by plaintiff’s expert of actual construction costs is clearly in error. Those costs were determined during various stages of the construction process and not as of the relevant assessing dates. For example, the cost of structural steel for the central portion of the Mall, the largest single material cost in the entire project, was established by contract in August 1974. Bamberger’s cost for steel was established in September 1974. A person seeking as of October 1,1977 to build a substitute for Quaker Bridge Mall would not have been able to benefit from these contract prices. In a similar vein, it was stipulated at trial that the data used by Wood & Tower to derive *532 construction cost and labor cost estimates were from July 1975 for the Mall stores, Bamberger’s and Hahne’s and from November 1975 for the Mall common areas.
Although plaintiff’s witness from Kraveo, Inc. and plaintiff’s appraiser testified that construction costs had been stable or even decreasing from 1973 through 1975, another of plaintiff’s expert witnesses was of the opinion that the cost approach should have been updated to reflect trends over time and that the approach presented by plaintiff was “incomplete” because it had not been adjusted.[18] Moreover, the current cost multipliers published in the Marshall Valuation Service and used by defendant’s first expert indicate an increasing cost of construction during this period. I am persuaded that the cost service data is based on more comprehensive and more objective market analysis than were the statements of plaintiff’s Kraveo witness and plaintiff’s appraiser. I therefore conclude that there was an increasing cost of construction during the relevant years.
Defendant’s experts were able by use of the Marshall Valuation Service to use costs as of the specific dates at issue. The first expert selected a base square foot cost as of October 1,1977 and adjusted that figure downward for each earlier assessing date by application of a current cost multiplier. Defendant’s second expert selected a different base square foot cost for each assessing date. Both of defendant’s experts were thus able to fine-tune their reproduction cost estimates in a way that plaintiff’s expert could not. I find the approach of defendants’ experts on this point to be more reliable because it is more current.
The other major difference among the three appraisers for plaintiff and defendant with regard to components they all used to derive value conclusions from the cost approach is in the areas *533 of department store and tenant finishes. The legal aspects of this subject have been discussed at some length above. As an example of the approach of plaintiffs expert, he developed a cost estimate of $6.60 a square foot as an average cost for certain tenant improvements to the Mall stores: installation of drywall, toilets, lavatory partitions, HVAC units, and the extension of electrical service and sprinkler systems from the rear of the stores. The valuation service used by defendant’s experts included not only the items plaintiff’s expert included but also the more comprehensive costs associated with occupancy of a commercial premises, such as wall and floor finishings, storefronts, windows, and plumbing and electrical fixtures. However, the costs of these items were not separately analyzed, as in plaintiff’s approach. Rather, they were incorporated in the per square foot factors published by the cost manual, the individual costs as such not being considered significant in the valuation process.
Plaintiff’s approach to this valuation problem permits an inherently more exact cost analysis. Nonetheless, since the comprehensive cost figures used by defendant’s experts more nearly comport with the court’s interpretation of what is real property as opposed to personal property, as discussed earlier under the heading Real Property v. Business Personal Property, the methodology of defendant’s experts produces a more realistic indication of the value of the premises. Plaintiff’s methodology as applied in this case simply leaves too many components of the real property unvalued.
For the reasons set forth, I find the reproduction cost estimates of value offered by defendant’s experts to be more reliable than that offered by plaintiff. Defendant’s two experts themselves differed in detail but the court will not undertake to break apart and recompute the intricacies of two essentially similar applications of a valuation service cost approach. I will adopt the cost estimate offered by defendant’s second expert because I am of the opinion that defendant’s first expert may have overvalued the retail shops in the Mall. He valued all 566,716 square feet of Mall central space at a final cost a square *534 foot of $20.17, yet he also valued the 390,439 square feet of retail shop space (part of the 566,716 square feet) at $64.63 a square foot. As a result of this effort to apply a more tailored approach to one structure of two different parts the expert valued the retail shops at $84.80 a square foot. This result may include some overlapping of values which is avoided by the other expert’s use of a uniform final unit cost of $50.53 for all square footage in the central portion of the Mall, whether retail shops or common areas. Accordingly, I adopt the following basic improvement values as reasonable reproduction cost estimates as of October 1, 1977:
Mall Central Portion
Bamberger’s
Hahne’s
Total
$28,632,958
10,468,345
6,406,970
$45,508,273
All experts agreed that an increment of value should be added for the site improvements itemized by plaintiff’s witnesses. These include paving and striping of the parking lot, fire mains and hydrants, site lighting, curbs and guardrails, sidewalks, fencing, traffic signs and manholes. The experts’ value estimates of these items were as follows:
Plaintiff
Defendant 1
Defendant 2
$1,846,000
$3,750,000
$2,000,100
Of these totals, only plaintiff’s was supported in any manner that could be objectively analyzed. Plaintiff’s expert used actual cost figures as the basis for his opinion. He allocated his total amount as follows: Mall central portion, $1,126,000; Bamberger’s, $436,000; Hahne’s, $284,000. Because of his documentation I find plaintiff’s value for additional site improvements to be the most reliable and I will adopt it in all respects.
One of the most significant disputes between the parties regarding the reproduction cost approach involves the concept of “entrepreneurial profit.” Plaintiff contends that there is no such profit that may be valued for ad valorem tax purposes yet *535 both of defendant’s experts valued it at approximately 10% of their improvement value derived from the reproduction cost method. I am persuaded that entrepreneurial profit is a legitimate element of market value that must be measured in this proceeding. The Appraisal of Real Estate states that “developer’s profit in a typical development also becomes part of cost new” in the reproduction cost approach. Id. at 264. Defendant’s first expert was most convincing that a realistic cost approach must recognize “adequate compensation to the entrepreneur to induce him to organize the entire project.” See Kahn, “The Entrepreneur — The Missing Factor,” The Appraisal Journal (Oct. 1963), at 472. See also, Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332, 343 (Tax Ct.1981). As defendant argues, no prudent developer would produce a property such as the Quaker Bridge Mall and sell it for his actual cost of land acquisition and construction. The developer’s raison d’etre is entrepreneurial profit.
In the present case, I find that plaintiff Lawrence Associates anticipated a substantial profit as the developer of Quaker Bridge Mall and that the amount of that profit is reflected in the market value of the Mall. The general partners in Lawrence Associates are R.H. Macy & Co., Inc. (through a subsidiary) and Kravco, Inc. When Kravco became aware in 1970 that Macy’s owned the Lawrence Township site involved in this proceeding and that the site had already been zoned for shopping center use, Kravco undertook to convince Macy’s that Kravco could put together a super regional shopping center at the site. Macy’s and Kravco discussed the formation of a partnership, the terms of which would be that Macy’s would sell its land to the proposed partnership and that the principals of Kravco would commit their own funds to develop the site until formal financing had been obtained. The Lawrence Associates partnership was formed in January 1973. The operating agreement between Lawrence Associates and the four department stores that formalized the commitment to develop Quaker Bridge Mall was not executed until December 1974. Institutional construction loan financing was obtained in June or July 1975.
*536 The Lawrence Associates partnership agreement was not introduced into evidence but the Kravco witness testified that the agreement contained a “kickout clause” which provided that, if the operating agreement were not executed and outside financing were not obtained, Macy’s and Kravco would terminate their relationship. At that point Macy’s would take back its land and the Kravco principals would absorb whatever early development costs had been incurred. Although neither Kravco nor its principals made any contribution to the Lawrence Associates partnership other than their time and expertise, they clearly had a great stake in the successful development of Quaker Bridge Mall. Because of Kravco’s desire to have the Mall open for business by a target date, the Kravco partners individually spent large sums to begin the development process. When they made these expenditures they had no guarantee that they would ultimately be reimbursed. By the time the Lawrence Associates partnership agreement had been signed, the Kravco interests had advanced approximately $400,000 of their own money for traffic, engineering and feasibility studies and for architectural and engineering fees. By the time institutional financing had been obtained the Kravco interests had advanced a total of from $2,500,000 to $5,000,000 of their own funds. This paid for extensive site grading and other preliminary site preparation. It was not until institutional funds became available to Lawrence Associates in the middle of 1975 that Lawrence Associates purchased the 85.47 acre site from Macy’s for $4,100,000 (plus an interest equivalent of $2,560,000), and then reimbursed the Kravco partners for their expenditures.
The Kravco principals would not have placed up to $5,000,000 of their own funds at risk unless they felt there was a very good probability that they would make a substantial profit as a result of their development of Quaker Bridge Mall. As defendant’s first expert testified, entrepreneurial profit is a developer’s return on creative effort and risk. Defendant’s second expert called it an incentive reward to developers. Although Kravco, Inc. received a fee of $563,000 from "Lawrence Associates to *537 develop Quaker Bridge Mall,[19] that payment must realistically be considered only a component of the entrepreneurial profit to be made from development of Quaker Bridge Mall, especially since Kravco’s efforts with respect to development of the Mall ranged from 1970 until the Mall was completed in 1977. During this extended period of time Kravco committed the time of its personnel and put large amounts of its capital or the capital of its principals at risk. The developer’s profit in the present case could be recouped only upon the sale of the Mall itself. For this reason the amount of that profit must be treated as an element of value for purposes of computing the value of the Mall pursuant to the reproduction cost approach.
The only measurement of this value suggested to the court was an amount equivalent to approximately 10% of the reproduction cost conclusion for the improvements constructed on the subject property. This was the opinion of both of defendant’s experts, albeit the percentage was computed in different ways by the experts. In the absence of any evidence in the record other than the opinion conclusion of the expert witnesses for this important element of the reproduction cost approach, and the amount appearing generally to be reasonable, I find that the factor of 10% is a reasonable profit expectation for the developer on a project such as Quaker Bridge Mall.
There is a disagreement between defendant’s experts, however, regarding the use of the 10% figure. Defendant’s first expert added 10% to reproduction cost before the addition of his site improvement value, whereas defendant’s second expert added it to his total including site improvement value. I find it more reasonable to compute the 10% entrepreneurial profit factor on the cost of the structure and site improvements together rather than on the reproduction cost of the structure alone. The developer’s profit would more likely be attributable to all the improvements that make his project a viable economic *538 entity. In the present case, the viability of a super regional shopping center might well be questionable if it did not include such site improvements as adequate on-site parking, lighting, drainage and sidewalks to permit convenient access for shoppers from their cars to the stores. I will therefore compute the 10% entrepreneurial profit factor on the basis of the reproduction cost of both buildings and site improvements.[20]
The sole remaining issue with regard to the cost approach is whether the cost of the highway overpass should be included. For reasons previously stated, I will add to my reproduction cost conclusion the amount of $1,600,000 for the overpass as testified to by plaintiff’s witnesses. However, I will not add a factor for entrepreneurial profit with respect to the value of the overpass. The overpass certainly enhances the value of the subject property because of the greater access it provides. Nonetheless, it is not an integral part of the Quaker Bridge Mall economic entity in the same sense as are site improvements such as the thirty-five acre parking lot and site lighting. Any super regional mall would have an ample parking area, integral ring roads and outside lighting for the convenience of its shoppers, but others would not necessarily need or have a highway overpass. Furthermore, since the overpass can be viewed as separate from the Mall proper, the concept of entrepreneurial profit would have to apply to the overpass separately. It is my conclusion that the concept does not apply in connection with the highway overpass because the overpass per se is not a commercial venture which an entrepreneur would be induced to construct with the expectation of earning a profit separate from that derived from the Mall itself. The overpass constructed by plaintiff was built solely to enhance the access to and the profitability of the Mall entity and was in the nature of a public improvement.

*539
C. Overall Value Indication

1. Block 47, Lot 5

The various value indications developed from the reproduction cost approach must be added together for an overall estimate of the value of the subject property as of October 1,1977, the latest of the assessing dates at issue. This recomputation for the major portion of the Quaker Bridge Mall (Block 47, Lot 5) results in an overall value indication of $63,050,700 as follows:
October 1, 1977
Raw Land (70.12 acres at $100,000/acre)
Site Improvements Incidental to Land (70.12 acres at $33,500/acre)
Total Land Value
Improvements'.
Mall Central Portion
$28,632,958
Bamberger’s
10,468,345
Hahne’s
6,406,970
Additional Site Improvements
Total Improvements
Entrepreneurial Profit (10%)
Overpass
Overall Value (rounded)
$ 7,012,000
2,349,020
$45,508,273
1,846,000
$ 9,361,020
$47,354,273
$ 4,735,427
$ 1,600,000
$63,050,700
This value indication must of course be adjusted for the earlier assessing dates dealt with by the experts and discussed in this opinion. I have previously determined certain components of the value as of the other dates and these values will therefore be used. This is true for the values of raw land and site *540 improvements incidental to land. The overpass was completed as of May 1,1976 and no proofs were offered as to value before that date. Accordingly, the overpass value will be used only from May 1, 1976. No adjustment will be made to that value for inflation because none of the experts made such an adjustment. I conclude that a consistent factor of 10% of improvement and site improvement value should be applied for entrepreneurial profit at even the early stages of Mall construction, because the developer would have sought such a profit had it sold the subject property at any time after construction had begun.
The value of improvements must be treated differently. Two very basic adjustments must be made to the October 1, 1977 improvement value determination. These modifications will reflect: (a) changes in construction costs from October 1,1975 to October 1,1977, and (b) the varying degrees of completion of the central portion of the Mall and the two department stores on the specified assessing dates. Since I have found defendant’s second expert’s application of the cost service manual to be the more appropriate I will adopt his figures for total reproduction cost of the improvements on the earlier dates. These totals incorporate applicable unit cost adjustments to reflect changes in construction costs. For example, this expert used the following base square foot costs for the central portion of the Mall:
October 1,1975 $39.51
May 1,1976 $39.98
October 1,1976 $41.00
October 1,1977 $43.38
Each of the relevant total reproduction cost figures will be set forth in the value computations for the specified dates.
Plaintiff’s expert based his opinion of values as of the assessing dates on actual construction costs and had no need to adjust his figures for percentage of completion. However, he did make estimates of degrees of completion for purposes of allocating such expenses as professional fees and financing costs. Defendant’s experts both adjusted their reproduction cost figures as of the assessing dates specified below in accordance with their *541 estimates of the percentages of completion as of those dates of the central portion of the Mall and of the two department stores. The three experts differed only slightly in these estimates. Since I have used defendant’s basic reproduction cost methodology, I will also adjust the final improvement valuation conclusion by a percentage of completion for the earlier dates. I find the following percentages of completion of the improvements to be reasonable for the dates indicated either because experts for both parties used them or because they were used by both of defendant’s experts and were nevertheless more favorable to plaintiff than the figures used by plaintiff’s expert:
October 1,1975
May 1, 1976
October 1,1976
October 1,1977
Mall
Central Portion Bamberger’s Hahne’s
55% 65% 40%
80% 100% 100%
100% 100% 100%
100% 100% 100%
An additional adjustment must be made with respect to the degree of completion of tenant improvements in the central portion of the Mall because these were constructed on a different schedule from the Mall structure itself. Defendant’s second expert, whose cost approach analysis I have adopted, took additional deductions to reflect that no tenant improvements were installed as of October 1,1975, only 40% were installed as of May 1, 1976 and 75% were installed as of October 1, 1976. The additional amounts he deducted as of these dates were, respectively, as follows: $2,913,392, $2,197,305 and $1,397,850. I will make the same deductions since I have found this expert’s cost approach as to improvements to be the most appropriate.
The value of the additional site improvements not incidental to land value also requires adjustment for the earlier assessing dates. I will allocate these amounts as of the earlier dates based on actual cost figures as detailed by plaintiff’s appraiser in his expert’s report. These figures are as follows:
*542 Oct. 1,1975 May 1,1976 Oct. 1,1976
Mall Central Portion $514,000
Bamberger’s $197,000
Hahne’s $129,000
$931,000 $1,126,000
$358,000 $ 436,000
$234,000 $ 284,000
Application of these considerations produces the following indicated values for Block 47, Lot 5 as a result of the reproduction cost approach for the three specified assessing dates:
October 1,1975
Raw Land (85.47 acres at $75,000/acre)
Site Improvements Incidental to Land (85.47 acres at $19,000/acre)
Total Land Value
Improvements:
Mall Central Portion ($26,077,825 at 55%, less $2,913,392 re tenant improvements)
Bamberger’s ($9,533,120 at 65%)
Hahne’s
($5,834,432 at 40%)
Additional Site Improvements:
Mall Central Portion
Bamberger’s
Hahne’s
$ 6,410,250
1,623,930
$11,429,412
6,196,528
2,333,773 $19,959,713
$ 514,000
197.000
129.000 840,000
$ 8,034,180
Total Improvements
Entrepreneurial Profit (10%) Overall Value (rounded)
$20,799,713
2,079,971
$30,913,900
*543 May 1,1976
Raw Land (85.47 acres at $80,000/acre)
$ 6,837,600
Site Improvements (85.47 acres at $28,000/acre)
2,393,160
Total Land Value
$ 9,230,760
Improvements:
Mall Central Portion ($26,391,949 at 80%, less $2,197,305 re tenant improvements) $18,916,254
Bamberger’s ($9,650,080 at 100%) 9,650,080
Hahne’s ($5,905,260 at 100%) 5,905,260 $34,471,594
Additional Site Improvements
Mall Central Portion $ 931,000
Bamberger’s 358,000
Hahne’s 234,000 1,523,000
Total Improvements $35,994,594
Entrepreneurial Profit (10%) 3,599,459
Overpass 1,600,000
Overall Value (rounded) $50,424,800
October 1, 1976
Raw Land (70.12 acres at $85,000/acre)
Site Improvements (70.12 acres at $33,50O/acre)
$ 5,960,200
Total Land Value
2,349,020
$ 8,309,220
Improvements (at 100%, less $1,397,850 re tenant improvements)
$44,110,423
*544 Additional Site Improvements:
Mall Central Portion
Bamberger’s
Hahne’s
$1,126,000
436.000
284.000 1,846,000
Total Improvements
$45,956,423
Entrepreneurial Profit (10%) Overpass
Overall Value (rounded)
4,595,642
1,600,000
$60,461,300

2. Block 45, Lot 51

The overall reproduction cost value indication for the 3.38 acre parcel located across Route 1 from Quaker Bridge Mall results from the addition of the values determined above for raw land and for site improvements incidental to land as of the October 1, 1976 and October 1, 1977 assessing dates. These totals are as follows:
October 1,1976
Raw Land (3.38 acres at $85,000/acre) $287,300
Site Improvements (3.38 acres at $33,500/acre) 113,230
Overall Value (rounded) $400,500
October 1,1977
Raw Land (3.38 acres at $100,000/acre) $338,000
Site Improvements (3.38 acres at $33,500/acre) 113,230
Overall Value (rounded) $451,200

*545
Market Approach

The market approach to the valuation of Block 47, Lot 5 was considered by all three appraisers. Among them the experts analyzed the sale of 18 transactions involving large shopping centers in seven states. They all held the opinion that the market for completed regional and super regional shopping centers was not limited to any geographical area because investors who seek properties of such magnitude tend to operate on a nationwide scale. In fact, the purchasers of such properties are often major institutional investors or investors from foreign countries who seek safe and stable investments in the United States.
None of the appraisers formed an opinion of the value of the Quaker Bridge Mall property from direct comparisons with any of the shopping center transactions he analyzed. Each found a lack of direct comparability, as was well stated by plaintiff’s appraiser:
Due to many complex economic ramifications of ownership of a regional enclosed mall, including but not limited to tax shelter considerations, lease structures (indicative of net rental income), existing and/or available financing and annual cash flow, comparison of the physical unit values produced by such sales tends to be almost meaningless. An enclosed regional mall shopping center is a highly sophisticated investment property where to one class of investors (usually individuals) tax shelter might be as important as actual annual cash flow, whereas to another class of investors (institutional types) cash flow is the paramount consideration if not the only consideration. But most importantly, investor motives are based on economic considerations which virtually eliminate the significance of physical units of comparison.
Although no expert reached a value conclusion using the market approach, each of the three appraisers used market data abstracted from sales transactions in the context of his income approach to value. In general the experts all drew conclusions from the market as to appropriate rates of return sought by investors in super regional shopping center acquisitions. Their conclusions will be discussed below in connection with capitalization rates used in the income approach.

*546
Income Approach

It is plaintiff’s position that the appropriate method for valuation of the Quaker Bridge Mall is the reproduction cost approach. The reason advanced by plaintiff for this position is that the Mall is a “specialty” property and that the income from it is derived principally from the operational and managerial efforts of the property’s owner rather than from the real property itself. This contention will be addressed in the context of the reconciliation of values resulting from the different approaches to value. Despite plaintiff’s position as a matter of law, plaintiff’s appraiser presented an income approach so that the court would have the benefit of an income analysis by plaintiff if that approach were used by the court.
Notwithstanding plaintiff’s position as to the inappropriateness of the income approach in the present case, the parties are in agreement that this method may in fact be used to value the Quaker Bridge Mall property at least as of October 1,1977 when all phases of the property had been completed and all stores were operating. The results obtained by plaintiff and defendant from use of this approach differ strikingly: plaintiff’s expert arrived at an overall opinion of value of $40,176,000 as of October 1, 1977 and defendant’s first and second appraisers arrived at corresponding opinions of $70,100,000 and $70,000,000, respectively.
Because of the enormous difference in the experts’ conclusions and their disagreement as to most of the components of the income approach the court will undertake to consider each aspect of the analysis separately for the central portion of the Mall and its stores and for the two department stores. All of the discussion below will pertain to the assessing date of October 1, 1977 unless otherwise indicated.

A. Mall Central Portion

1. Gross Income

The most difficult determination that needs to be made in connection with the income approach is the estimate of gross *547 income for the Mall stores. This is particularly difficult because many factors must be considered and the experts are in considerable disagreement over almost all of them. All the experts agree, however, that the rental structure at Quaker Bridge Mall, which is typical of super regional malls, consists of a base rent and, in the case of most tenants, an “overage” or “percentage” rent payable on sales volume above a specified minimum level.[21]
a. Gross Leasable Area
The initial disagreement among the experts concerns the gross leasable area of the central portion of the Mall. Plaintiff’s appraiser made his income calculations based on 387,700 square feet of retail space and 2,739 square feet of storage space. Defendant’s first appraiser used 391,210 square feet for retail space and 709 square feet for office space. He also attributed rental income to 6 kiosks in the Mall common area. Defendant’s second appraiser used 392,376 square feet for retail space, 641 square feet for 6 kiosks and 3,385 square 1'eet for storage. Both of defendant’s experts included copies of the rent rolls for the central portion of the Mall in their appraisal reports and I find as a fact from the rent rolls that the following figures reflect the actual space devoted to the stated uses: 392,376 square feet for retail space, 641 square feet for kiosks, 3,385 square feet for storage and 709 square feet for office.

b. Basic Economic Rent

The next dispute involves the amount of basic economic rent that should be attributed to the various types of space in the *548 central portion of the Mall. Unless otherwise indicated, the rental figures discussed in this section are all net rents for unfinished space or “shells.” Plaintiff’s expert concluded that the actual annual contract amounts of base minimum rent for Mall space were representative of economic rent. He used an average net rent of $7.91 a square foot for all central Mall space (based on an overall average of $7.95 for rented retail space, $8.00 for unrented retail space and $2.50 for unrented storage space) for a total gross potential economic rent of $3,089,016. This expert supported his conclusion that actual rents were the equivalent of economic rent by an analysis of rentals at three other super regional malls in New Jersey, the Deptford and Ocean County Malls, previously mentioned, and the Echelon Mall in Voorhees Township, Camden County. He found average net rentals per square foot for comparable retail space at these malls to be as follows: $7.38 at the Deptford Mall, $8.21 at the Ocean County Mall and $8.05 and $8.44 (in 1975 and 1978, respectively) at the Echelon Mall.
Defendant’s first expert found $7.95 a square foot to be the average base minimum rent for retail space at the Quaker Bridge Mall. He concluded that this amount was reflective of the market for the beginning of the time frame in question in this litigation, based on his examination of rent rolls of two New Jersey malls, the Ocean County Mall and Riverside Square in Hackensack, Bergen County. However, this expert found that the net income stream from the subject property would rise because of increasing percentage rentals (6% of base contract minimum rents as of December 31,1977 and 11% as of December 3, 1978). Accordingly, this expert was of the opinion that economic rent for the subject property should be stabilized at $8.35 a square foot or 105% of actual initial term base minimum rents for retail space, although it was also his opinion that only anticipated actual rents should be used for unrented retail space. He thus used $3,275,608 as the basic economic rent for retail *549 space[22] as opposed to $3,089,016 as used by plaintiff’s expert. A much more substantial and significant difference in the economic rent analyses of these experts involves defendant’s expert’s use of additional income sources, but this will be discussed below.
Defendant’s second appraiser also found an average net rental of $8.35 a square foot of gross leasable area of the Mall retail stores to be reflective of economic rent as of October 1, 1977. This figure is 105% of the actual average minimum base rental rate at Quaker Bridge Mall. He added the additional 5% because he found economic conditions affecting the subject property to have improved significantly in the two years that had passed since many of the leases had been negotiated (during construction of the shopping center), and because comparable results at the Ocean County Mall and two malls in eastern Pennsylvania supported the higher figure. This expert found average net rentals a square foot for comparable retail shell space at these malls to be as follows: $8.42 at the Ocean County Mall, $9.14 at the Granite Run Mall and $7.48 at the Springfield Mall. His gross economic rent potential for retail space in the central portion of Quaker Bridge Mall was $3,276,340. He also considered as economic rent the average net rent of $2.50 a square foot for the 3,385 square feet of storage space for a total of $8,462. This expert’s basic economic rent potential for retail and storage space was thus $3,284,802.
Based on the testimony of the experts I find $8.35 a square foot of retail shell space and $2.50 a square foot of storage space to be economic net rents for the subject property as of October 1,1977. The comparable rents cited by all experts were generally higher than actual Quaker Bridge Mall base minimum rents. The comparable rents also support a conclusion that average economic rents increased slightly in the time after the Quaker Bridge leases were negotiated. Plaintiffs expert implicitly recognized this point in attributing a value of $8.00 a square foot to *550 space unrented as of October 1, 1977 rather than the $7.95 he found applicable for rented space. Therefore the addition of a 5% increment to actual rents is a reasonable indication of economic rent as suggested by defendant’s second expert. The storage rental fee of $2.50 a square foot was used by both plaintiff and defendant and is undisputed. Application of these figures results in a gross economic net rent as of October 1,1977 of $3,284,802 for retail and storage space in the central portion of the Mall (392,376 sq. ft. X $8.35 = $3,276,340 and 3,385 sq. ft. X $2.50 = $8,462).
c. Additional Income
One of the most critical disagreements between the parties is whether income in addition to that from the economic rent equivalent of base minimum rents may be considered in the income approach. The significance of this issue is evident from the fact that plaintiff’s expert considered no such income and defendant’s first and second experts used additional income from various sources of $1,509,308 and $379,898, respectively. The categories of additional income treated by defendant’s experts will be discussed individually.

(1) Kiosks and Office Space

As of October 1, 1977 there were four kiosks in the common area of the Mall and two more were in the planning stage. The kiosks occupied space of from 81 to 120 square feet. Tenants of these kiosks sell such items as candy, nuts and costume jewelry. They pay the highest rentals for any retail space in the Mall (an average of $60 a square foot) because of their high visibility and their location in the midst of traffic patterns. It is my conclusion that the rent from the kiosks should be considered as income to be capitalized just as is the minimum rent paid for regular retail stores. It is real income to the owner of the property. Defendant’s second expert’s use of $38,460 (641 sq. ft. X $60) was undisputed as an indication of economic rent and I will adopt that figure for this source of income.
*551 There are 709 square feet of office space within the Mall complex which is used by either plaintiff or Kravco. It therefore is not rented to tenants and it generates no income. However, this is an example of the type of space for which economic rent must be imputed because it is capable of generating income to the property’s owners just as is retail shop space, or, in the case of an apartment property, just as is the apartment made available to a resident superintendent. Inclusion of economic rent for such space may or may not be offset by the deduction of appropriate expenses. Defendant’s first expert was the only appraiser to include an income figure for office space. For economic rent for this space he used the amount of $10 a square foot which he testified was supported by numerous comparable office rents. The reasonableness of this figure was not disputed and I will therefore impute rental income for the office space at the rate of $10 per square foot. Accordingly, I find economic rent for the office space to be $7,090 (709 sq. ft. X $10).

(2) Percentage Rents

Defendant’s second expert added $332,976 of percentage rent to his economic rent determination in order to calculate potential gross income from the stores leased to Mall tenants. In his opinion, percentage rents represent actual additional income generated from the subject property for calendar year 1978 which should therefore be considered. Percentage rent has been defined as:
Rental income received in accordance with the terms of a percentage clause in a lease and related to the tenant’s gross or net sales, as defined by the lease. A minimum rent is usually included, although a straight percentage lease is occasionally encountered. A maximum rental may be specified. In effect, the percentage lease makes the landlord a partner in the tenant’s business and provides the lessor some protection against inflation. [The Appraisal of Real Estate, supra at 329]
Percentage rent as such should not be added to economic rent for two reasons. In the first place, percentage rent should be considered in the process of determining economic rent and not as a separate component of the income stream to be capital *552 ized. The Appraisal of Real Estate, supra at 414 — 416. The fact that there were percentage rents of $332,976 in 1978 corroborates the use of an economic rent higher than actual rents for retail space at the Quaker Bridge Mall as of October 1, 1977. However, inclusion of percentage rent as a separate and additional income stream would result in that value indicator being reflected twice when of course it should be treated only once. Secondly, as the definition of the term states, a percentage lease in effect “makes the landlord a partner in the tenant’s business.” Since the amounts of percentage rent are based on a tenant’s business performance, it is conceivable that in some instances they are more indicative of the value of that business than they are of the value of the real property. However, only the latter is relevant to this proceeding. The value of a tenant’s business is not subject to ad valorem tax by the municipality. Aetna Life Insurance Co. v. Newark, 10 N.J. 99, 107-109, 89 A.2d 385 (1952).

(3) Tenant Finishes

The largest amount of additional income which defendant contends should be capitalized relates to tenant improvements to the Mall stores. Defendant’s first expert attributed $900,806 of income to tenant improvements in his calculation of anticipated annual income as of October 1, 1977. He derived this total from the use of 375,336 square feet of space actually improved by tenants and an income stream from the improvements which he valued at a net rental figure of $2.40 a square foot.[23]
The expert’s theoretical justification for imputing income to the tenant finishes was uncomplicated and persuasive. In his *553 opinion plaintiff’s appraiser had valued essentially the unfinished concrete shells as they were leased to tenants. Defendant’s expert likened the central portion of the Mall as appraised by plaintiff’s expert to warehouses and 130 caves without lights. He said the unfinished shells were not representative of the highest and best use of the subject property as a super regional shopping center, which is how defendant’s expert appraised the Mall. In his judgment a tenant would pay at least 30% more for finished space in a finished shopping center than he would for a concrete shell. In this context the expert used the term “finished” space to mean tenant stores with storefronts, floor and wall coverings, finished sheetrock, dividing partitions, lavatories and other plumbing, completed wiring and installed HVAC. I find that a comparison of photographs of unfinished shells with finished space supports the expert’s testimony to the extent that a tenant would certainly pay considerably more for finished than for unfinished retail space. Application of the expert’s estimate of 30% to $7.95 a square foot (the average minimum net rental for retail space as of October 1, 1977) produced the $2.40 rent imputed by defendant’s expert as the estimated income stream from tenant improvements.
I am convinced by two specific considerations that the opinion of defendant’s first expert should be adopted on this issue. In the first place the expert tested and substantiated his judgment with data obtained from plaintiff concerning tenant finishing costs and allowances and from the local building inspector’s records of building permit applications made by tenants for the improvements at issue. Thus, the 30% factor used by the expert was not simply his opinion but was corroborated by an actual cost analysis. In the second place this expert has extensive credentials in the appraisal profession and his performance in court during many days of direct and cross examination convinced the court of the soundness of his professional judgment.
It simply cannot be ignored that the improvements made by the Mall tenants created finished space that was more valuable income property than was the series of concrete shells plaintiff leased to its tenants which had an economic rental value of $8.35 *554 per square foot as of the October 1,1977 assessing date. It may or may not be accurate, as argued by plaintiff, that the tenant finishes of one tenant were of no value to a succeeding tenant, but that is not relevant. The finishes added value to the Mall structure and that value must be recognized in the income approach. Furthermore, for the reasons advanced by defendant’s first expert, an income stream must be imputed to the tenant improvements in an effort to determine the value of the subject property at its highest and best use, not as a series of concrete shells. See Wayne Mall, Inc. v. Wayne Tp., supra, 2 N.J.Tax at 18-19. I will therefore adopt this expert’s figure of $900,806 as indicative of the income stream attributable to tenant improvements at the Mall stores as of October 1, 1977.

(4) Electricity, Hot and Chilled Water, Trash Removal

The second largest amount of additional income which defendant’s experts capitalized consists of plaintiff’s net income from Mall tenants for the sale of electricity, for the sale of hot and chilled water to be used in the heating and air conditioning systems, and for charges for trash removal. Plaintiff purchases all electricity for the central portion of the Mall directly from a regulated electric utility at bulk rates but plaintiff sells the electricity to its tenants at retail rates. Tenants do not have individual meters and pay plaintiff for their electricity according to a usage formula based on the relative sizes of their rented space. Similarly, plaintiff purchases water from a public utility, converts it into hot or chilled water with its centralized equipment and provides the converted water to its tenants for an amount above its costs. The tenants also pay for this service according to a predetermined formula based on rental area. See generally, Antique Village Inn, Inc. v. Pacitti, Robins & Anglin, Inc., 160 N.J.Super. 554, 390 A.2d 681 (Law Div.1978). Plaintiff also makes arrangements with a trash hauler for trash removal in lieu pf separate arrangements by the tenants with private trash haulers. Plaintiff makes a profit on this service.
Plaintiff argues that these sources of income should be disregarded. It states that its tenants pay no more than they would *555 if they had separate meters or separate service contracts and paid retail rates directly to public utility companies. According to plaintiff, by purchasing utility services at bulk rates and reselling them at retail rates it is engaging in a legitimate business practice on the subject premises unrelated to the value of the real estate. It equates its net income from these sources to income from the individual businesses of its tenants and not to income from a passive investment in real property which it concedes may be considered for purposes of the income approach. Plaintiff relies primarily on Aetna Life Insurance Co. v. Newark, supra, for this argument.
Aetna does not stand for the proposition for which it is advanced by plaintiff. In that case the court refused to consider a formula based on sales volume at a Bamberger’s store as competent or sufficient evidence to establish the market value of the property. The court held that sales volume was “subject to the variables of goodwill and management practices which are factors entirely foreign to the true value of the real estate as such.” Id. 10 N.J. at 109, 89 A.2d 385. Essentially the same point was made in Humble Oil v. Englewood Cliffs, 135 N.J.Super. 26, 342 A.2d 560 (App.Div.1975), aff’d o.b. 71 N.J. 401, 365 A.2d 929 (1976). In that case involving a property tax assessment on a gasoline station the court found that
... gallonage figures, depending as they do on the brand of gasoline sold, the skill and efficiency of the dealer, the advertising efforts made, etc., are more reflective of the business conducted on the property than on [sic] the market value of the real estate for assessment purposes. [135 N.J.Super. at 30, 342 A.2d 560]
Accord McCrory Stores Corp. v. Asbury Park, 89 N.J.Super. 234, 241, 214 A.2d 526 (App.Div.1965).
This is not what is involved in the present case. Defendant’s experts have not used the equivalent of income from tenants’ stores to value the subject property. They have used only the net income stream flowing to or imputed to plaintiff from the rental of its real property. All such income is directly attributable to plaintiff solely by virtue of its right to exclusive occupancy and control of the subject property. Plaintiff’s tenants pay according to the terms of their leases to be able to operate at *556 Quakerbridge Mall and if they did not make such payments, plaintiff would not relinquish its right to possession and control of its property. Plaintiff’s charges for electricity, for hot and chilled water and for trash removal are an integral aspect of plaintiff’s rental of retail space because Mall tenants are obligated by their leases to make these payments as a condition of their occupancy of the Mall.
Plaintiff argues that it is inappropriate for defendant township to tax this additional income under the guise of a local property tax but it is clear that the value of plaintiff’s real property is enhanced because of the owner’s ability to sell utility services to its tenants. As defendant’s second expert observed, the revenue obtained by plaintiff from these sales is intrinsic to the site; it could not be generated by a competitor at another location. Except for the regulated public utilities which could otherwise charge plaintiff’s tenants directly, only the owner-developer of the Mall is in a position to make a profit on such sales of electricity, hot and chilled water and trash removal. Thus, these profits are from and are indicative of the value of plaintiff’s investment in the subject real property. Accordingly, net income to plaintiff from these three sources must be capitalized (no proof having been presented as to gross income and expenses).
The amount of this income was computed by defendant’s first expert at the net rate of $1.25 per square foot of gross leasable area of retail shop space. This would produce a figure of net income from these sources of $490,470 (392,376 square feet X $1.25). However, the actual net income to plaintiff from the sale of utility services to its Mall-tenants in 1977 was as follows:
electricity $198,000
hot and chilled water 213,000
trash removal 22,000
total net income $433,000
In the circumstances of this case I find the use of actual net income to be a more reliable basis for determining economic net rent from these income sources than is the per square foot estimate of defendant’s first expert. I will therefore use the *557 figure of $433,000 of net income from the sale of utility services for valuation purposes as of October 1, 1977.

(5) Miscellaneous Income

Plaintiff receives additional annual income from the rental of baby strollers, storage lockers, the rental of space for public telephones and from a variety of special events. It argues again that these revenues are from separate business ventures independent of its passive real estate investment and that the income should not be considered in valuing the real property. Defendant responds again that the income should be included in the income stream to plaintiff from its ownership of the Mall. The applicable law is discussed in the preceding section. See Aetna Life Insurance Co. v. Newark, supra; Humble Oil v. Englewood Cliffs, supra.
Except for the storage locker fees and telephone rental income I do not find from the evidence in this case that the additional amounts of income sought to be included by defendant are directly analogous to rentals charged by plaintiff for occupancy of its premises. Income to plaintiff from the rental of baby strollers, for example, is akin to income to a tenant from its retail sales. This being so, it is my conclusion based on this record that the additional sources of income other than as noted below are from plaintiff’s independent business operations and should not be considered in the income approach to value. Plaintiff’s receipts from storage lockers and from the telephone company, however, are the same kind of income it receives from Mall tenants. As a consequence, storage locker charges and telephone rental income should be treated as part of the income stream to be capitalized. Despite this conclusion, I do not find from the presentation of the experts any reliable basis for estimating either the actual or the economic value of this income. As a result, I will not include any amount for miscellaneous income in the income approach.

2. Vacancy Rate

All three appraisers applied a rate for vacancy and credit loss in the process of determining effective gross income *558 from the stores in the central portion of the Mall. Plaintiff’s expert used a factor of 5% as of October 1, 1977 based on an actual vacancy rate of 2.32% and unspecified rental losses from bankrupt tenants and from turnover periods. Defendant’s first expert used an estimated rate of 6%. Defendant’s second expert used 5% for rental income from retail stores, kiosks and storage space but applied no vacancy rate to the various sources of additional income.
The 5% rate is reasonable. It is slightly more than twice the amount of actual vacancies and is therefore adequate also to cover any foreseeable credit losses. Cf. Murnick v. Asbury Park, 2 N.J.Tax 168, 180 (Tax Ct.1981), rev’d in part on other grds. 187 N.J.Super. 455, 455 A.2d 504 (App.Div.1982), certif. den.-N.J. - (1983), appeal docketed, No. 20,701 (Jan. 7, 1983). Application of the rate to all aspects of gross income is appropriate because an informed investor would project a pattern of less than 100% collection from all income sources. Ibid.

3. Expenses

All experts agreed that in conformity with current management practices for super regional shopping centers, the Quakerbridge Mall tenants’ leases were all “absolutely net,” meaning that the tenants were required to pay virtually all expenses of the property and all income received by the owner was net income to it. This was accomplished through such devices as required contributions by all tenants to a common area maintenance fund for operational and maintenance costs, membership fees in the Merchants’ Association to cover promotion and advertising and the purchase of utility services as previously discussed.[24] As a consequence of this lease structure, the experts differed with respect to whether a deduction for expenses should be taken from plaintiff’s effective gross income in order to determine its net income. Defendant’s first expert took no expense deduction and treated effective gross income as *559 net operating income. The other two appraisers took deductions for expenses.
Plaintiff’s expert deducted the following amounts reported by management as its own share of expenses, over and above any direct payments by or reimbursements from tenants: repairs, $9,000; insurance, $2,000; professional fees, $31,000; advertising, $33,000; management fee to Kravco, Inc., $150,000; and miscellaneous, $20,000. These amounts total $245,000. Defendant’s second expert allowed $175,000 for expenses, consisting of the actual management fee of $150,000 and miscellaneous expenses of $25,000.
In the absence of any contrary indication, I find it reasonable with respect to a new mall such as this to equate actual expenses with economic expenses. Accordingly, I will deduct expenses in the amount of $245,000 from plaintiff’s effective gross income to determine its net income.

4. Capitalization Rate

Each of the three appraisers developed his indication of value by direct capitalization of net income using an overall capitalization rate. The experts used very similar methodologies to develop their overall rates, each using a band of investment analysis. Any differences were differences of judgment pertaining to typical financing arrangements and rates of return on debt and equity. The differences were minor. Each also tested his choice of a capitalization rate against data he abstracted from market transactions. The rates used by plaintiff’s expert and by defendant’s first and second experts were 9.66%, 9.5% and 9.3%, respectively.
I find the overall capitalization rate determined by defendant’s first expert to be the most reliable because it was better supported by that expert’s market data findings. Specifically, the expert relied on more New Jersey transactions and on more recent transactions than the other experts did, and he also found a narrower range of overall capitalization rates from these sales than the other experts did from their sales. Accordingly, I will *560 adopt an overall capitalization rate of 9.5% as appropriate in the present case.

5. Recapitulation and Value Estimate

Application of the considerations discussed above produces an estimate of $44,062,600 as the value of the central portion of the Mall by use of the income approach for the October 1, 1977 assessing date, as follows:
October 1,1977
Gross Income:
Basic Economic Rent
Kiosks and Office Space Tenant Finishes
Electricity, Hot and Chilled Water, Trash Removal
Vacancy and Credit Loss (5%)
Effective Gross Income Expenses
Net Income
Capitalized at 9.5% (rounded)
$3,284,802
45,550
900,806
433,000 $ 4,664,158
233,208
$ 4,430,950 - 245,000
$4,185,950
$44,062,600

B. Bamberger’s and Hahne’s

1. Gross Income

The determination of gross income for the two department stores is considerably less involved than it is for the central portion of the Mall. The parties agree that the gross leasable areas of Bamberger’s and Hahne’s are 214,000 square feet and 151,465 square feet, respectively. Furthermore, none of the additional income discussed in connection with the tenant stores in the Mall is pertinent to the valuation of the department stores. Therefore, the only determination that needs to be made on this point is the amount of economic rent to be attributed to these owner-occupied stores. As with most other points in this *561 litigation, the experts are quite far apart. Plaintiff’s expert found economic rents for Bamberger’s and Hahne’s to be $3.75 and $3.25 a square foot, respectively. The township’s first expert found economic rents to be $6.50 and $6.00 and its second expert found them to be $6.15 and $5.40, respectively.
Plaintiff’s expert derived an economic rent figure from his analysis of three department store leases, one at the Ocean County Mall and two at eastern Pennsylvania malls. Two of the stores were J.C. Penney’s. His square foot rental estimates from his comparables were $2.75, $3.60 and $2.85 net of taxes. However, as plaintiff’s other appraiser concluded, these figures represent the rental of building shells rather than completed department stores.[25] For reasons discussed above, the structure as a shell is not indicative of the highest and best use of the subject property.
Defendant’s first expert found few comparable rentals but used as one comparable a junior department store lease at Riverside Square in Hackensack at $7.18 a square foot net, including tenant finishes. This expert also used the J.C. Penney lease at the Ocean County Mall but he adjusted the $2.75 a square foot actual rent to $5.50. He did this because of the continuing relationship between the developer of the Ocean County Mall and J.C. Penney as a major department store. This discount or subsidy factor was mentioned above in connection with land values and I find the expert’s observation to be supported in the present context by the analysis in the addendum to his appraisal report. Furthermore, the J.C. Penney rent has to be adjusted to reflect tenant finishes and this adjustment from $2.75 to $5.50 a square foot accomplishes this. Defendant’s first expert also supported his economic rent conclusion by an analysis of leases for less prestigious space at the Mercer Mall on Route 1 in Lawrence Township, near the subject property.
Defendant’s second expert found little comparable lease information because most major department stores are owner-occu *562 pied, as are Bamberger’s and Hahne’s in this case. He supported his economic rent figures with the first two leases used by the township’s first expert and by an analysis of the amount of net income that would be needed to carry typical debt service on the department stores and to provide an adequate rate of return on the land.
I find the analysis of the township’s first expert to be the most persuasive. His rental data was all from New Jersey and his treatment of the major department store-developer relationship is documented and convincing. Equally important, his comparison of leases for less desirable department store space in a smaller mall in the immediate vicinity of Quaker Bridge Mall establishes with a reasonable degree of certainty the lower end of the range of economic rent for the subject property. For these reasons I will adopt as economic rent as of the October 1, 1977 assessing date the amount of $6.50 a square foot for Bamberger’s and $6.00 a square foot for Hahne’s.

2. Vacancy Rate, Expenses and Capitalization Rate

Although the department stores are owner-occupied, a vacancy rate and credit loss factor must be applied to their gross income in order to determine effective gross income just as is done in the case of third-party leases. This is so because economic conditions, not necessarily actual conditions, are being valued. Defendant’s experts both used the same vacancy rate for the department stores as they did for the Mall stores; plaintiff’s expert considered vacancy and credit loss to be “nil”. There being no apparent reason for the court to employ a different rate with respect to the department stores than for the Mall stores, I find 5% to be appropriate.
As with the Mall stores, it is necessary for a deduction for expenses to be made from effective gross income in order to determine net income for the department stores. The following expenses reported by plaintiff’s expert are reasonable and will be allowed: insurance, $12,800 for Bamberger’s and $9,100 for Hahne’s; exterior maintenance, $6,400 for Bamberger’s and *563 $4,550 for Hahne’s; and 4% of effective gross annual income for the management for each store. Finally, for the reasons set forth in connection with the Mall stores, I find an overall capitalization rate of 9.5% to be applicable to both stores.

8. Recapitulation and Value Estimate

These conclusions produce separate estimates of the values of the Bamberger’s and Hahne’s department stores as of October 1, 1977. The recapitulation for Bamberger’s is as follows:
October 1,1977
Gross Income (214,000 sq. ft. x $6.50/sq. ft.)
Vacancy and Credit Loss (5%)
Effective Gross Income
Expenses:
Insurance $12,800
Exterior Maintenance 6,400
Management (4%) 52,858
Net Income
Capitalized at 9.5% (rounded)
The figures for Hahne’s are as follows:
Gross Income (151,465 sq. ft. x $6.00/sq. ft.)
Vacancy and Credit Loss (5%)
Effective Gross Income
Expenses:
Insurance
Exterior Maintenance Management (4%)
Net Income
Capitalized at 9.5% (rounded)
$ 1,391,000
- 69,550
$ 1,321,450
- 72,058
$ 1,249,392
$13,151,500
October 1, 1977
$ 908,790
- 45,440
$ 863,350
$ 9,100
4,550
34,534
- 48,184
$ 815,166
$8,580,700

*564
C. Overall Value Indication

The value estimates developed above from use of the income approach reflect a total indicated value of $65,794,800 for the property under appeal as of the assessing date of October 1, 1977, as follows:[26]
October 1,1977
Mall Central Portion
Bamberger’s
Hahne’s
$44,062,600
13,151,500
8,580,700
Overall Value
$65,794,800
This overall value estimate must be adjusted to the extent practicable to reflect values as of the earlier assessing dates. However, the property was under construction during part of the time at issue and it is clear that none of the property was producing income as of the October 1, 1975 assessing date. Bamberger’s and Hahne’s were open for business as of April 1976, as was the Mall itself, but only 43% of the Mall tenant stores were leased as of that date. The tenant stores were 62% leased as of October 1, 1976 and 97% leased as of October 1, 1977. Because of these circumstances plaintiff’s expert did not use the income approach to derive a separate value for the subject property prior to October 1,1977. Similarly, defendant’s first expert used the income approach as a separate methodology only for the last two assessing dates, for which he found the same overall value.[27]
*565 Defendant’s second expert was the only one to offer an independent analysis of the income approach for all assessing dates dealt with by all three appraisers under the reproduction cost approach. Whereas this expert was of the opinion that the overall value indication for the subject property as of October 1, 1977 was $70,000,000 using the income approach, he was of the opinion that the value on the earlier dates using the same approach was as follows: $27,500,000 as of October 1, 1975, $51,125,000 as of May 1, 1976 and $62,650,000 as of October 1, 1976. His conclusions varied because for each earlier assessing date he made an adjustment of his rates per square foot for space in the Mall stores and in the department stores (based on comparable rents), for amounts of additional income (including his value increment attributable to tenant finishes which he computed according to the cost approach), for the percentage of completion of each structure and for his capitalization rate. Each of these adjustments resulted in a lower overall value for the earlier years. He did not use a proportionately lower expense deduction even though it would have produced a higher value each year and thus would have benefited the township.
The income approach modifications made by defendant’s second expert for the earlier years are reasonable and appropriate. I am in agreement with the opinion expressed by both of defendant’s experts that the income approach may be used to determine the value of a property that has not been fully rented. As discussed previously, the actual leasing experience of a property is not necessarily representative of market conditions and in any event economic rent rather than actual rent must be considered. Parkview Village Associates v. Collingswood, supra; New Brunswick v. Div. Tax Appeals, supra. Thus, even without actual rentals an economic rent may be imputed for valuation purposes. Moreover, the income approach may validly be used to estimate the prospective value of improvements that have not yet been constructed. In fact, as defendant’s first appraiser testified, it is common practice within the appraisal profession to estimate the value of proposed improvements for purposes of obtaining mortgage or construction fi *566 nancing. If a proposed building is to be income-producing, a projected net income stream is developed with respect to the building from an analysis of rentals for comparable properties. The methodology in all other respects is identical to that used for a completed structure.
As noted above, the only opinion developed for the value of the Quaker Bridge Mall from use of the income approach as of the earlier dates was that of defendant’s second expert. Although I did not adopt each of the components of his income analysis as of October 1,1977,1 find his approach to be generally sound in its particulars except for two points: a) he included percentage rents from the Mall tenants in gross income as of October 1, 1976, and b) he did not apply a vacancy rate to department store rentals and miscellaneous income. After extracting the percentage rent figure from this expert’s computation as of the October 1, 1976 date and applying a 5% vacancy allowance to all gross income, I have recomputed the expert’s income approach presentations. This produces the following overall value indications for the dates specified: $26,838,200 as of October 1,1975; $49,985,633 as of May 1,1976 and $59,697,200 as of October 1, 1976.
These conclusions having been derived from the use of a sound methodology and with the use of reasonable components, and no other value opinions having been advanced by the experts, I find that these recomputed totals are the most reliable income approach estimates in the record of this case of the overall value of the Quaker Bridge Mall property (Block 47, Lot 5) as of the relevant assessing dates. I therefore adopt these totals as my income approach conclusions for the three dates set forth above.

Reconciliation

The overall value indications as developed above using the reproduction cost and income approaches for the major property involved in this proceeding (Block 47, Lot 5) must be reconciled for each of the assessing dates dealt with by the experts. In summary, those values are as follows:
*567 Reproduction Cost Approach
October 1,1975
May 1,1976
October 1,1976
October 1,1977
$30,913,900
$50,424,800
$60,461,300
$63,050,700
Income
Approach
$26,838,200
$49,985,633
$59,697,200
$65,794,800
As a matter of law plaintiff contends that the Quaker Bridge Mall should be valued for all relevant dates pursuant to the reproduction cost approach. Despite this position plaintiff’s expert relied primarily on the income approach to value the central portion of the Mall as of October 1, 1977. Nonetheless, plaintiff’s legal argument needs to be addressed. That argument, in essence, is that the Quaker Bridge Mall is a “specialty property” which plaintiff suggests is
... property which, unlike the typical investment real estate such as an apartment house or an office building, generates income principally from the operation of a business associated with the real estate rather than from mere ownership of the property.
Plaintiff classifies the following as typical examples of such specialty properties: department stores, utilities, golf courses, racetracks, drive-in theaters and hotels.
Without expressing a general opinion on the “specialty property” theory plaintiff seeks to have this court adopt, it is my conclusion that Quaker Bridge Mall does not fit within the definition plaintiff itself proposes as a description of such a property. The income generated by Quaker Bridge Mall is principally from typical rents for retail shopping space and not from the operation of an independent business. Only a small portion of the income can be attributed to the latter source. The figures developed above in the income analysis as of October 1, 1977 demonstrate that the income from sources which plaintiff considers an independent business (the sale of utility services) is only 9.2% of the gross income attributable to the *568 central portion of the Mall.[28] That same amount of utility income is only 6.2% of the gross income attributable to the Mall, Bamberger’s and Hahne’s together.[29]
Beyond this, however, the evidence in this proceeding establishes unequivocally that super regional shopping centers are prime investment properties that are bought and sold throughout the United States. Thus, a super regional shopping center cannot be said to be a special purpose or unique property for which there is no market. Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax at 495. Nor is there a “special” quality inherent in any such shopping center to make it uniquely suited to its present owner, as might be said, for example, of a reservoir owned and operated in conjunction with a regulated public utility water system. See Hackensack Water Co. v. Old Tappan, 77 N.J. 208, 390 A.2d 122 (1978). Accordingly, the subject property should be valued pursuant to the proofs adduced in this proceeding and not pursuant to any single valuation theory.
All appraisers agreed that major judgment factors are involved in any effort to value a property as large and complex as Quaker Bridge Mall. The appraisers disagreed, of course, in the exercise of their judgment as to the most appropriate approach to value the subject property as of each assessing' date they considered. Plaintiff’s expert relied primarily on the reproduction cost for all value conclusions except for the final value of the Mall, in which case he placed greater reliance on the income approach. Defendant’s first expert placed more reliance on the reproduction cost approach for his first two value conclusions but he placed more reliance on the income approach for his final two value conclusions. Defendant’s second expert relied primarily on the income approach for each of his conclusions.
*569 In my opinion the income approach is the preferable approach to use for the May 1,1976, October 1,1976 and October 1, 1977 assessing dates. The Mall is an income property and an investor would typically analyze the potential income stream to determine the property’s market value. As of these dates the investor would have had sufficient trustworthy data with which to make such an analysis. However, I am of the opinion that the reproduction cost approach provides a more reliable indication of the value of the property as of the date of the partial assessment (October 1, 1975) because the property had not yet opened for business and income estimates would have been somewhat speculative.
For these reasons, it is my opinion that the most appropriate overall true value of the subject property for the dates set forth below is as follows:
Overall True Value
October 1,1975
May 1,1976
October 1,1976
October 1,1977
$30,913,900
$49,985,633
$59,697,200
$65,794,800

Discrimination

In addition to its arguments concerning the true value of the subject property, plaintiff contests its assessments for each year on the grounds of discrimination, that is that the assessments were at a level of assessment substantially in excess of the common level of assessment in the taxing district. See, e.g., Piscataway Associates, Inc. v. Piscataway, 73 N.J. 546, 376 A.2d 527 (1977); In re Appeal of Kents, 34 N.J. 21, 166 A.2d 763 (1961). The relief plaintiff seeks in connection with this allegation is the establishment of its assessments each year at the percentage of true value which is indicative of the common level of assessment in the township. Because the law of discrimination was changed by statute effective with the tax year 1978 (L. 1973, c. 123), the discrimination issue for 1976 and 1977 will be discussed separately from the discussion pertaining to 1978.

*570
A. 1976 and 1977

Plaintiff presented testimony of an expert who had conducted an analysis of sales of real property in Lawrence Township compared with the assessments on those properties. See Niktan Realty Co. v. Passaic, 1 N.J.Tax 393, 403-407 (Tax Ct.1980). In the opinion of the expert, the common levels of assessment in the taxing district, and the percentage of true value at which the assessments should be set, were 75% for 1976 and 72% for 1977. In support of his opinion the expert reviewed the procedures used by the Director of the Division of Taxation to develop annual sales ratios for all taxing districts in the State. He set forth in his expert’s report the sales and assessment data used by the Director to determine Lawrence Township’s average ratio for two separate years. He said the data was for the overall period of July 1, 1975 through June 30, 1977. However, as will be discussed below, the expert was mistaken about these dates.
Nonetheless, I am satisfied of two things from the Director’s published data. First, the general coefficients of deviation for Lawrence Township indicate that most of the individual ratios of assessment to sale price fell within a fairly narrow range throughout the relevant years (14.83% for 1975,15.31% for 1976, 17.64% for 1977 and 15.51% for 1978). Cf. R.M.P. Holding Co. v. Passaic, 1 N.J.Tax 359, 369-371 (Tax Ct.1980); Whippany Associates v. Hanover Tp., 1 N.J.Tax 325, 334-335 (Tax Ct.1980). Second, an arrangement of individual ratios by percentage increments indicates that most such ratios clustered in the range of from 50% to 89%. Cf. Niktan Realty Co. v. Passaic, 1 N.J.Tax at 403-405; R.M.P. Holding Co. v. Passaic, 1 N.J.Tax at 367-369.
I conclude from these indications that a common level of assessment existed in Lawrence Township at a figure other than 100% for the years 1976 and 1977. I also conclude that a common level as such may be determined from the record of sales in the township.
The remaining question is what the better measure of the common level of assessment is for Lawrence Township for 1976 *571 and 1977. Traditionally, the Director’s average ratio for the tax year has been applied in discrimination cases to establish an assessment at a percentage of the true value determined for a specific property. See In re Appeals of Kents, supra, 34 N.J. at 27, 31-33, 166 A.2d 763; Feder v. Passaic, 105 N.J.Super. 157, 161, 251 A.2d 457 (App.Div.1969); Niktan Realty Co. v. Passaic, supra. Despite the precedent for use of the Director’s average ratio, plaintiff’s expert advocates use of a component of the Director’s ratio — the unweighted, unclassified ratio derived from sales for a one-year period from July 1 to the following June 30. The expert contends that there is a tight clustering of individual sales ratios around the one-year ratios. He also observes, correctly, that the overall coefficient of deviation published by the Director measures variance from the unweighted, unclassified ratio rather than from the average ratio.
The unweighted, unclassified ratio has been adopted by the Tax Court as more representative of the common level of assessment than the Director’s average ratio in years prior to 1978 in only one instance, in Gaynes v. Edison, 179 N.J.Super. 373, 2 N.J.Tax 500, 432 A.2d 127 (App.Div.1980), certif. den. 85 N.J. 501, 427 A.2d 588 (1981). In that case the Appellate Division appended to its opinion the findings and conclusions of Judge Andrew of the Tax Court who held that the average of three separate one year, unweighted, unclassified ratios should be applied rather than the Director’s average ratio for any one year to eliminate inequality in assessment practices in Edison Township for 1974, 1975 and 1976. In Sunshine Biscuits, Inc. v. Sayreville, supra, Judge Andrew again applied a three-year average of the unweighted, unclassified ratios for 1978,1979 and 1980 to establish a common level for 1979 and 1980, years in which Chapter 123 relief did not apply for various reasons.
In the present case plaintiff’s expert did not establish by a preponderance of the evidence that the single year ratios would be more indicative of the common level of assessment than the Director’s ratios would be. The expert did not offer any opinion that a statistician could determine with any particular degree of confidence that ratios of individual transactions would fall with *572 in the specified narrow range of ratios represented by the single-year ratio as was testified to in Sunshine Biscuits. Id. at 506-508. Moreover, he was not aware of the number of line items (separate assessments) in Lawrence Township in any year and as a consequence his opinion as to what would constitute an adequate sampling of sales to test assessing practices in the township is somewhat suspect. Skytop Gardens, Inc. v. Sayreville, 3 N.J.Tax 187, 200-202 (Tax Ct.1981), aff’d o.b. 5 N.J.Tax 478 (App.Div.1983), certif. den. 93 N.J. 306, 460 A.2d 700 (1983).
More importantly, the expert was confused about the time periods involved in the data used in the Director’s sales-ratio studies and he relied on data one year older than he thought it was. For example, the expert testified that the Director’s average ratio of 85.07% was the 1976 ratio promulgated on October 1, 1976 and based on sales data from July 1, 1975 to June 30,1976. The Director’s 1975 Annual Report indicates that the 85.07% average ratio was promulgated in the prior year, on October 1,1975. Since the Director uses data from the period of July 1 to June 30 ending in the year he promulgates his school aid table, in this instance on October 1,1975, the sales he used in connection with the 85.07% ratio were necessarily from July 1, 1974 to June 30, 1975 rather than from one year later as plaintiff’s expert testified. See Gaynes v. Edison, 179 N.J.Super. at 381-382, 2 N.J.Tax at 507-508, 432 A.2d 127.
The same shortcoming inheres in the expert’s recital of the Director’s average ratio of 88.23%. This is actually his 1976 ratio rather than the 1977 ratio as the expert claimed and it was promulgated on October 1, 1976, not October 1, 1977. Accordingly, it was based on an analysis of sales from July 1, 1975 to June 30, 1976 rather than from one year later as the expert thought.
As a direct result of this miscalculation by plaintiff’s expert, he unwittingly relied on sales data going as far back as July 1, 1974 when he arrived at his opinion as to appropriate ratios for 1976 and 1977. Consequently, even though data from a more *573 recent sampling period could have been used consistent with the expert’s theory that the ratio from a one-year study would be more appropriate than the Director’s average ratio, no such data was presented to the court for its consideration.
It is my conclusion that the Director’s average ratios are more indicative of the common level of assessment in Lawrence Township for 1976 and 1977 than are the ratios suggested by plaintiff’s expert. Use of the average ratio has been sustained for many years. In re Appeals of Kents, supra; Feder v. Passaic, supra; Niktan Realty Co. v. Passaic, supra. Use of the average ratio provides for a certain stability of assessments from year to year because it is based not only on current sales and assessment data but also on the results of prior years’ analyses of assessing practices. Feder v. Passaic, 105 N.J.Super. at 162-163, 251 A.2d 457; Jefferson House Investment Co. v. Chatham, 4 N.J.Tax 669 (Tax Ct.1982).
The only matter that needs to be resolved, therefore, is whether the Director’s average ratios for the tax year or for the pretax year should be applied in the present case. In my opinion the Director’s ratios promulgated during the tax years at issue are the better indicator of assessing practices in those years. For example, the Director’s ratio of October 1, 1976 was based on sales data from July 1, 1975 to June 30, 1976. The assessing date for the tax year 1976 was October 1, 1975. Consequently, the sales data upon which the Director’s 1976 ratio was based not only overlaps the assessing date but also provides nine months of transactions subsequent to the assessing date with which to test the assessing practice in the taxing district. The sales data used in the Director’s 1975 table, on the other hand, was from July 1, 1974 to June 30, 1975 and would not provide as current an indication of the level of assessment as of the October 1, 1975 assessing date. Gaynes v. Edison, 179 N.J.Super. at 388, 2 N.J.Tax at 514, 432 A.2d 127. Compare, 525 Realty Holding Co. v. Hasbrouck Heights, 3 N.J.Tax 206, 212-216 (Tax Ct.1981).
*574 The Director’s average ratios for Lawrence Township promulgated on October 1,1976 and October 1,1977 were substantially lower than 100%. They were 88.23% and 81.82%, respectively. There is considerable authority for averaging these ratios in the interest of stability of assessments. Feder v. Passaic, 105 N.J. Super, at 162, 251 A.2d 457; Sunshine Biscuits, Inc. v. Sayreville, 4 N.J.Tax at 509. Nonetheless, use of a broader sampling of sales to establish a relatively stable ratio for any one year is somewhat different from averaging the final conclusions for two separate years, each of which was itself derived from the broader sales sampling. In many cases, of course, both types of averaging are done. Ibid. However, the rationale for averaging ratios for separate years does not apply in the present context of assessments made over a period of years while a major structure was under construction. Since the original 1976 assessment was $13,576,700 and the original 1977 assessment was $53,459,100, it would be impossible to achieve stability even if the same ratio were used. I therefore find the ratios of 88.23% and 81.82% to be indicative of the common level of assessment in Lawrence Township for 1976 and 1977, respectively-

B. 1978

With regard to discrimination in the tax year 1978, Chapter 123 of the Laws of 1973 provides a straightforward mechanism for determining the common level of assessment in any taxing district. N.J.S.A. 54:l-35a, b and c. Plaintiff’s expert relied on Chapter 123 for his discrimination conclusion. Furthermore, the Appellate Division has recently held that “the Legislature mandated the use of Chapter 123 as an exclusive remedy subject to the exceptions contained therein.” Murnick v. Asbury Park, 187 N.J.Super. at 459, 455 A.2d 504. Accordingly, for 1978 discrimination purposes I will use the Director’s Chapter 123 average ratio for Lawrence Township of 73% and the common level range of from 63% to 84%.

*575
Conclusion

The appropriate assessment for each of the assessing dates involved in this proceeding may be determined from the true value and discrimination conclusions already reached. For the sake of clarity, I will discuss each assessment separately.

A. Block 47, Lot 5

1. 1976 Assessment

The original 1976 assessment of $13,576,700 is only 43.92% of the court’s October 1,1975 true value determination of $30,913,-900. This is substantially below the common level of assessment in Lawrence Township for 1976 of 88.23%. It is immediately apparent from these computations that the 1976 assessment was substantially lower, not higher, than it should have been. Application of the common level ratio of 88.23% to the property’s true value produces an appropriate 1976 assessment for the subject property of $27,275,300.
Subsequent to the trial of this matter, plaintiff’s counsel wrote to the court in connection with the filing of its proposed findings of fact and post-trial briefs. In its letter counsel said:
We would call to the Court’s attention that the 1976 regular assessment (made as of October 1, 1975) is among those matters pending appeal; however, the taxpayer has elected not to contest that assessment and the enclosed submissions, therefore, do not address that subject. The appeal has not been withdrawn, however, because of its possible impact on the determination of the 1976 added assessment (made as of May 1,1976) [see discussion Petitioner’s Post Trial Brief, text at nn. 185 and 185] [sic] and to avoid any question of waiver with respect to the latter assessment.
The effect of plaintiff’s letter is to leave open as an issue the appropriate assessment for 1976. Plaintiff could have sought leave to withdraw the 1976 assessment from the court’s consideration even after the close of proofs. Cherry Hill Tp. v. U.S. Life Insurance Co. of N.Y., 176 N.J.Super. 254, 1 N.J.Tax 236, 422 A.2d 810 (Tax Ct.1980); R. 8:3-9. Plaintiff did not seek to do so.
As long as the jurisdiction of the court has been properly invoked to review a local property tax assessment it is the *576 obligation of the court to determine the appropriate assessment. This is so even if the result is to increase an assessment in the context of a taxpayer’s case and even if the taxing district has not itself filed a complaint or counterclaim seeking such an increase. As the Appellate Division has explained:
... there is no sound reason to give a taxpayer the benefit of an erroneous valuation simply because, for whatever reason, the taxing district has failed to cross-appeal. Indeed, our Constitution forbids “preferential treatment in real property taxation....” [footnote omitted] Princeton Tp. v. Bardin, 147 N.J. Super. 557, 566 [371 A.2d 776] (App.Div.1977), certif. den. 74 N.J. 281 [377 A.2d 685] (1977). “[T]rue value is still ... the foundation for property assessments in New Jersey.” Passaic v. Gera Mills, 55 N.J.Super. [73] at 82 [150 A.2d 67]. NJ.S.A. 54:4-23. We conclude that in arriving at a determination of true value, the Tax Court is authorized by N.J.S.A. 54:2-35 to assess the property at that value, even if it exceeds the original assessment, regardless of whether the taxing district has appealed that assessment. [Rabstein v. Princeton Tp., 187 N.J.Super. 18, 24, 453 A.2d 553 (App.Div.1982)]
Although the Appellate Division in Rabstein did not deal with the issue of discrimination, the reasoning of that opinion must logically be extended to the discrimination context. I will therefore direct the Clerk of the Tax Court to increase the 1976 original assessment on the subject property from $13,576,700 to $27,275,300 so that the assessment will be consistent with assessing practices generally in Lawrence Township for the tax year 1976.

2. 1976 Added Assessment

The purpose of the added assessment statute[30] is to permit the taxation of real property which becomes taxable during the *577 year following the assessing date of October 1 in order to avoid having properties escape taxation until the next assessing date arrives. Snyder v. South Plainfield, 1 N.J. Tax at 7. In the present case the 1976 added assessment reflected the assessor’s determination of the value of the subject property as of May 1, 1976, immediately following the April opening of Quaker Bridge Mall, including Bamberger’s and Hahne’s.
I have determined the overall true value of the subject property to be $49,985,633 as of May 1, 1976. The 1976 assessment of $27,275,300 as modified above, plus the full 1976 added assessment of $38,935,300 (before proration for eight months), are 132.46% of this true value total. The added assessment is therefore clearly excessive (the 1976 assessment already having been modified). Thus, the true value figure of $49,985,633 must be reduced for assessment purposes to the common level of assessment in Lawrence Township. I have previously applied the Director’s average ratio promulgated on October 1, 1976 to reflect discrimination for the tax year 1976. Even though the added assessment in this case represents value as of May 1,1976 and not as of October 1, 1975, it is reasonable to employ a consistent discrimination ratio for an entire tax year. Furthermore, the current sales data used by the Director to develop his October 1,1976 ratio was from the period of July 1,1975 to June 30, 1976 and thus encompassed the May 1, 1976 date. I will therefore apply the ratio of 88.23% to the overall May 1, 1976 true value determination of $49,985,633. The product of this calculation is $44,102,300 (rounded).
The last-mentioned figure reflects the appropriate total assessment for the 1976 tax year. The nature of an added assessment is to reflect that portion of the total appropriate assessment for a tax year which was not included in the original assessment as of October 1 of the pretax year. Since the correct original assessment for 1976 has now been determined to be *578 $27,275,300, the full added assessment as of May 1, 1976 should be $16,827,000 ($44,102,300 less $27,275,300). This amount prorated for eight months results in an appropriate added assessment of $11,218,000.

3. 1977 Assessment

Computation of the 1977 assessment is straightforward. The true value of the subject property as of October 1, 1976 was $59,697,200. Application of the Director’s average ratio of 81.82% promulgated on October 1, 1977 results in the sum of $48,844,200. Since the 1977 assessment was in the total amount of $53,459,100 it must be reduced to $48,844,200.

4. 1977 Added Assessment

The prorated amount of this assessment as of February 1, 1977 was $1,483,900. Oddly enough, none of the experts focused on the issue of value as of this added assessment date and I am unable to arrive at any conclusion regarding an appropriate assessment as of then. The 1977 added assessment will therefore be affirmed. Rodwood Gardens, Inc. v. Summit, supra.

5. 1978 Assessment

This computation is a straightforward application of Chapter 123 of the Laws of 1973. The 1978 assessment of $55,077,900 is 83.71% of the true value determination of $65,794,800. The common level range of permissible assessments according to the Director of the Division of Taxation is from a lower limit of 63% to an upper limit of 84%. The ratio for the subject property falls within the acceptable range by a fraction of a percentage point and it must therefore be affirmed.
The court is very much aware that a slightly lower true value conclusion for 1978 could produce a ratio of assessment to true value for the subject property that would fall on the outside of the acceptable common level range of assessments. For exam- *579 pie, had the court adopted its overall reproduction cost conclusion of $63,050,700 as the better indicator of true value than the income approach conclusion, the resultant ratio of assessment to true value would be 87.35%. In that instance, Chapter 123 would require application of the average ratio of 73% and a reduction of the assessment from $55,077,900 to $46,027,000, a difference of $9,050,900. Nevertheless, having come to an objective conclusion regarding true value without consideration for the ramifications of that decision, I will apply Chapter 123 as written by the Legislature and I will direct the affirmance of the 1978 assessment. Cf. Murnick v. Asbury Park, supra.

6. 1978 Added Assessment

No proofs were presented with respect to this added assessment of $85,800 and it will be affirmed. Rodwood Gardens, Inc. v. Summit, supra.

B. Block 45, Lot 51

1. 1977 Assessment

The 1977 assessment on this 3.38 acre parcel was $259,400. The only proofs offered with regard to this tract were discussed in the context of the reproduction cost approach. The true value total from the use of that approach was $400,500. The ratio of the assessment to true value is 65%. This is substantially below the common level of assessment in Lawrence Township as indicated by the Director’s average ratio of 81.82%, As a consequence the 1977 assessment must be increased from $259,-400 to $327,700 ($400,500 X 81.82%). Rabstein v. Princeton Tp., supra.

2. 1978 Assessment

The 1978 assessment was also $259,400. This figure is only 57% of the true value conclusion of $451,200 and thus is below *580 the lower limit of the Chapter 123 common level range of 63%. The 1978 assessment must therefore be raised to $329,400 ($451,-200 X 73%). Id.

Judgment

For purposes of allocating total values between land and improvements as required for assessment purposes I will maintain where practicable the original land assessments. The Clerk of the Tax Court shall enter the following judgment:
Block 47, Lot 5
Land
Improvements
Total
Land
Improvements
Total
Land
Improvements
Total
Block 45, Lot 51
Land
Improvements
Total
1976 Assessment
$ 2,559,000 .
24,716,300
$27,275,300
1977 Assessment
$ 3,506,100
45,338,200
$48,844,300
1978 Assessment
$ 3,506,100
51,571,800
$55,077,900
1977 Assessment
$327,700
0
$327,700
1976 Added Assessment (as of May 1,1976)
$ 0 11,218,000
($16,827,000 prorated for 8 months)
$11,218,000
1977 Added Assessment (as of Feb. 1, 1977)
$ 0 1,483,900
($1,618,800 prorated for 11 months)
$ 1,483,900
1978 Added Assessment (as of July 1,1978)
$ 0 85,800
($171,600 prorated for 6 months)
$85,800
1978 Assessment
$329,400
0
$329,400

The J.C. Penney and Sears stores were separately owned and separately assessed. Their assessments, for both land and improvements, are not involved in this proceeding except as noted in footnote 2, infra.

Block 47, Lot 5 consisted of 85.47 acres prior to the 1977 assessment because 15.35 acres had not yet been conveyed to Sears.

The 1976 assessment on Block 45, Lot 51 was not appealed.

The 15.35 acre Sears tract is included in the 1976 assessments because it was then owned by plaintiff.

This case was exhaustively presented. It required 20 days of trial time which were followed by a detailed inspection of the premises by the court and counsel. Trial exhibits, including reports of several appraisers and additional experts, were voluminous. Consequently, counsel were directed to file comprehensive proposed findings of fact and post-trial briefs.

The experts’ treatment of lighting fixtures for general illumination is not consistent.

Section 7 of the New Jersey act provided as follows:
If the goods are so affixed to realty, at the time of a conditional sale or subsequently as to become a part thereof, and not to be severable wholly or in any portion without material injury to the freehold, the reservation of property as to any portion not so severable shall be void after the goods are so affixed, as against any person who has not expressly assented to the reservation. [L.1919, c. 210, § 7]

 A similar treatment appears in the provisions of the Uniform Commercial Code dealing with secured transactions, which superceded the Uniform Conditional Sales Act. In the code, it is provided that the rules pertaining to the priority of security interests in fixtures “do not apply to goods incorporated into a structure in the manner of lumber, bricks, tile, cement, glass, metal work and the like. ...” N.J.S.A. 12A:9 313(1)

The value of the entire property must be determined pursuant to the added assessment statute. See N.J.S.A. 54:4-63.2. The value of the land is one aspect of the overall value and it must be dealt with in that context.

$39,100-$32,100 = $7,000; $7,000 13 mos. = $538/mo.; $538/mo. X 12 = $6,456/yr.; $6456 - $32,100 = 20%/yr.

See supra note 9, at 517.

Both in fact used the date of November 1976 rather than October 1, 1976 because site improvements were completed as of the latter date.

Site improvements were completed in November 1976. Neither expert who gave an opinion regarding site improvement values made a change in his site improvement value figure from October 1, 1976 to October 1, 1977. Since neither expert did, the court will likewise refrain from doing so.

See supra note 9, at 517.

Sitework incidental to land value was previously discussed in conjunction with land value.

Plaintiffs expert did not value the entire property using the reproduction cost approach as of October 1, 1977. His latest value using this approach *528 was as of October 1, 1976. However, since he made no adjustments for time in his report his value conclusion as of October 1, 1976 would presumably be the same for October 1, 1977.

Exclusive of site improvements which all experts treated separately, but also exclusive of the value of the overpass and of any factor for “entrepreneurial profit” which plaintiffs expert contended should not be considered.

This witness was not only an appraiser but was also a professor of real estate at the school of business at the University of Wisconsin. The witness was not requested by plaintiff to prepare an opinion of the value of the subject property but was offered on the subject of appraisal methodology with regard to super regional shopping centers.

The record does not disclose how the amount of this fee was determined or when it was received.

The Marshall Valuation Service does not include any value increment for entrepreneurial profit and therefore no duplication of this amount will occur.

In addition to the base minimum rent and any percentage rent, the typical lease at Quaker Bridge Mall requires Mall tenants to pay a pro rata share of such expenses as real estate taxes, common area maintenance and even plaintiffs fire, liability, workers’ compensation and rent insurance. In the words of the Kravco witness, “every single item of expense incurred by the landlord” with respect to the physical management of Quaker Bridge Mall (except for the salaries of three supervisory personnel of Lawrence Associates) “are direct charges to the tenants absorbed by them in proportion to their percentage of occupancy of the Mall.”

This expert attributed no additional income to Mall storage space.

Defendant’s second expert was also of the opinion that the value of tenant improvements at the Mall should be included for purposes of valuing the subject property. However, he did not impute a rental value to such improvements. Rather, he added to his income approach conclusion a value for tenant improvements based on the reproduction cost approach. For this reason his treatment of tenant improvements need not be considered in this discussion of the income approach.

See also, supra note 21, at 547,

See, supra note 18, at 532.

This statement does not apply to Block 45, Lot 51 because that parcel is not income-producing and it cannot be valued pursuant to the income approach.

Defendant’s first expert used the income approach indirectly for all years, however, because he derived his formula to estimate entrepreneurial profit from a comparison of his October 1, 1977 value conclusions using the reproduction cost and income approaches. His October 1, 1977 value indication from the income approach exceeded his value indication from the standard cost approach by approximately $5,400,000, and he attributed the difference to entrepreneurial profit, a factor approximating 10% of improvement value. He used the same percentage factor for the earlier years.

$433,000 from the sale of utility services as opposed to gross income of $4,664,158. See, supra p. 560.

$433,000 from the sale of utility services as opposed to gross income of $6,963,948 (The Mall, $4,664,158; Bamberger’s, $1,391,000; Hahne’s, $908,-790). See, supra pp. 560 and 563.

The pertinent part of the added assessment statute is as follows:
... when any parcel of real property contains any building or other structure which has been erected, added to or improved after October 1 and completed between January 1 and October 1 following, the assessor shall, after examination and inquiry, determine the taxable value of such parcel of real property as of the first of the month following the date of ... such completion, and ... if such value so determined exceeds the assessment made as of October 1 preceding, the assessor shall enter an assessment, as an added assessment against such parcel of real property, in the “Added Assessment List, 19,” which assessment shall be determined as follows: by multiplying the amount of such assessment or such excess by the number of whole months remaining in the calendar year *577 after the date of ... such completion, and dividing the result by 12. [N.J.S.A. 54:4-63.3]